(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHRISTIAN LEGAL SOCIETY CHAPTER OF THE UNIVERSITY OF CALIFORNIA, HASTINGS COLLEGE OF THE LAW, AKA HASTINGS CHRISTIAN FELLOW-SHIP *v.* MARTINEZ ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1371. Argued April 19, 2010—Decided June 28, 2010

Respondent Hastings College of the Law (Hastings), a school within the University of California public-school system, extends official recognition to student groups through its "Registered Student Organization" (RSO) program. Several benefits attend this school-approved status, including the use of school funds, facilities, and channels of communication, as well as Hastings' name and logo. In exchange for recognition, RSOs must abide by certain conditions. Critical here, all RSOs must comply with the school's Nondiscrimination Policy, which tracks state law barring discrimination on a number of bases, including religion and sexual orientation. Hastings interprets this policy, as it relates to the RSO program, to mandate acceptance of all comers: RSOs must allow any student to participate, become a member, or seek leadership positions, regardless of her status or beliefs.

At the beginning of the 2004–2005 academic year, the leaders of an existing Christian RSO formed petitioner Christian Legal Society (CLS) by affiliating with a national Christian association that charters student chapters at law schools throughout the country. These chapters must adopt bylaws that, *inter alia*, require members and officers to sign a "Statement of Faith" and to conduct their lives in accord with prescribed principles. Among those tenets is the belief that sexual activity should not occur outside of marriage between a man and a woman. CLS interprets its bylaws to exclude from affiliation anyone who engages in "unrepentant homosexual conduct" or holds religious convictions different from those in the Statement of Faith.

Syllabus

Hastings rejected CLS's application for RSO status on the ground that the group's bylaws did not comply with Hastings' open-access policy because they excluded students based on religion and sexual orientation.

CLS filed this suit for injunctive and declaratory relief under 42 U. S. C. §1983, alleging that Hastings' refusal to grant the group RSO status violated its First and Fourteenth Amendment rights to free speech, expressive association, and free exercise of religion. On cross-motions for summary judgment, the District Court ruled for Hastings. The court held that the all-comers condition on access to a limited public forum was both reasonable and viewpoint neutral, and therefore did not violate CLS's right to free speech. Nor, in the court's view, did Hastings impermissibly impair CLS's right to expressive association: Hastings did not order CLS to admit any student, nor did the school proscribe any speech; Hastings merely placed conditions on the use of school facilities and funds. The court also rejected CLS's free exercise argument, stating that the Nondiscrimination Policy did not single out religious beliefs, but rather was neutral and of general applicability. The Ninth Circuit affirmed, ruling that the all-comers condition on RSO recognition was reasonable and viewpoint neutral.

*Held*:

1. The Court considers only whether a public institution's conditioning access to a student-organization forum on compliance with an all-comers policy violates the Constitution. CLS urges the Court to review, instead, the Nondiscrimination Policy as written—prohibiting discrimination on enumerated bases, including religion and sexual orientation. The policy's written terms, CLS contends, target solely those groups that organize around religious beliefs or that disapprove of particular sexual behavior, and leave other associations free to limit membership to persons committed to the group's ideology. This argument flatly contradicts the joint stipulation of facts the parties submitted at the summary-judgment stage, which specified: "Hastings requires that [RSOs] allow any student to participate, . . . regardless of [her] status or beliefs. For example, the Hastings Democratic Caucus cannot bar students holding Republican political beliefs . . . ." This Court has long recognized that parties are bound by, and cannot contradict, their stipulations. See, *e.g., Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 226. The Court therefore rejects CLS's attempt to escape from the stipulation and shift its target to Hastings' policy as written. Pp. 8–12.

2. The all-comers policy is a reasonable, viewpoint-neutral condition on access to the RSO forum; it therefore does not transgress First Amendment limitations. Pp. 12–31.

Syllabus

(a) The Court's limited public forum decisions supply the appropriate framework for assessing both CLS's free-speech and expressive-association claims; those decisions recognize that a governmental entity, in regulating property in its charge, may impose restrictions on speech that are reasonable in light of the purposes of the forum and viewpoint neutral, *e.g., Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829. CLS urges the Court to apply to its expressive-association claim a different line of cases—decisions in which the Court has rigorously reviewed restrictions on associational freedom in the context of public accommodations, *e.g., Roberts* v. *United States Jaycees*, 468 U. S. 609, 623. But, because CLS's expressive-association and free-speech arguments merge—*who* speaks on its behalf, CLS reasons, colors *what* concept is conveyed—it makes little sense to treat the claims as discrete. Instead, three observations lead the Court to analyze CLS's arguments under limited-public-forum precedents.

First, the same considerations that have led the Court to apply a less restrictive level of scrutiny to speech in limited public forums, as compared to other environments, apply with equal force to expressive association occurring in a limited public forum. Speech and expressive-association rights are closely linked. See *id.,* at 622. When these intertwined rights arise in exactly the same context, it would be anomalous for a speech restriction to survive constitutional review under the limited-public-forum test only to be invalidated as an impermissible infringement of expressive association. Second, the strict scrutiny the Court has applied in some settings to laws that burden expressive association would, in practical effect, invalidate a defining characteristic of limited public forums—the State's authority to "reserv[e] [them] for certain groups." *Rosenberger*, 515 U. S., at 829. Third, this case fits comfortably within the limited-public-forum category, for CLS may exclude any person for any reason if it forgoes the benefits of official recognition. The Court's expressive-association decisions, in contrast, involved regulations that *compelled* a group to include unwanted members, with no choice to opt out. See, *e.g., Boy Scouts of America* v. *Dale*, 530 U. S. 640, 648. Application of the less-restrictive limited-public-forum analysis better accounts for the fact that Hastings, through its RSO program, is dangling the carrot of subsidy, not wielding the stick of prohibition. Pp. 12–17.

(b) In three cases, this Court held that public universities had unconstitutionally singled out student groups for disfavored treatment because of their points of view. See *Healy* v. *James*, 408 U. S. 169; *Widmar* v. *Vincent*, 454 U. S. 263; and *Rosenberger*. Most recently and comprehensively, in *Rosenberger*, the Court held that a university generally may not withhold benefits from student groups

because of their religious outlook. "Once it has opened a limited [public] forum," the Court emphasized, "the State must respect the lawful boundaries it has itself set." 515 U. S, at 829. It may "not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, . . . nor may it discriminate against speech on the basis of . . . viewpoint." *Ibid.* Pp. 17–19.

(c) Hastings' all-comers policy is reasonable, taking into account the RSO forum's function and "all the surrounding circumstances." *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 809. Pp. 19–28.

(1) The Court's inquiry is shaped by the educational context in which it arises: "First Amendment rights must be analyzed in light of the special characteristics of the school environment." *Widmar*, 454 U. S., at 268, n. 5. This Court is the final arbiter of whether a public university has exceeded constitutional constraints. The Court has, however, cautioned courts to resist "substitut[ing] their own notions of sound educational policy for those of . . . school authorities," for judges lack the on-the-ground expertise and experience of school administrators. *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176, 206. Because schools enjoy "a significant measure of authority over the type of officially recognized activities in which their students participate," *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 240, the Court approaches its task here mindful that Hastings' decisions about the character of its student-group program are due decent respect. Pp. 19–21.

(2) The justifications Hastings asserts in support of its all-comers policy are reasonable in light of the RSO forum's purposes. First, the policy ensures that the leadership, educational, and social opportunities afforded by RSOs are available to all students. RSOs are eligible for financial assistance drawn from mandatory student-activity fees; the policy ensures that no Hastings student is forced to fund a group that would reject her as a member. Second, the policy helps Hastings police the written terms of its Nondiscrimination Policy without inquiring into an RSO's motivation for membership restrictions. CLS's proposal that Hastings permit exclusion because of *belief* but forbid discrimination due to *status* would impose on Hastings the daunting task of trying to determine whether a student organization cloaked prohibited status exclusion in belief-based garb. Third, Hastings reasonably adheres to the view that its policy, to the extent it brings together individuals with diverse backgrounds and beliefs, encourages tolerance, cooperation, and learning among students. Fourth, the policy incorporates state-law discrimination proscriptions, thereby conveying Hastings' decision to decline to subsi-

dize conduct disapproved by the State. So long as a public school does not contravene constitutional limits, its choice to advance state-law goals stands on firm footing. Pp. 21–24.

(3) Hastings' policy is all the more creditworthy in light of the "substantial alternative channels that remain open for [CLS-student] communication to take place." *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 53. Hastings offered CLS access to school facilities to conduct meetings and the use of chalkboards and certain bulletin boards to advertise events. Although CLS could not take advantage of RSO-specific methods of communication, the advent of electronic media and social-networking sites lessens the importance of those channels. Private groups, such as fraternities and sororities, commonly maintain a presence at universities without official school affiliation. CLS was similarly situated: It hosted a variety of activities the year after Hastings denied it recognition, and the number of students attending those meetings and events doubled. "The variety and type of alternative modes of access present here," in short, "compare favorably with those in other [limited public] forum cases where [the Court has] upheld restrictions." *Id.,* at 53–54. Pp. 24–25.

(4) CLS's arguments that the all-comers policy is not reasonable are unavailing. CLS contends that there can be no diversity of viewpoints in a forum when groups are not permitted to form around viewpoints, but this argument confuses CLS's preferred policy with constitutional limitation—the *advisability* of Hastings' policy does not control its *permissibility*. A State's restriction on access to a limited public forum, moreover, "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U. S., at 808. CLS's contention that Hastings' policy will facilitate hostile takeovers of RSOs by student saboteurs bent on subverting a group's mission is more hypothetical than real; there is no history or prospect of RSO-hijackings at Hastings. Cf. *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 584. Finally, CLS's assertion that Hastings lacks any legitimate interest in urging religious groups not to favor coreligionists erroneously focuses on the benefits the group must forgo, while ignoring the interests of those it seeks to fence out. Hastings, caught in the crossfire between a group's desire to exclude and students' demand for equal access, may reasonably draw a line in the sand permitting *all* organizations to express what they wish but *no* group to discriminate in membership. Pp. 25–28.

(d) Hastings' all-comers policy is viewpoint neutral. Pp. 28–31.

(1) The policy draws no distinction between groups based on their message or perspective; its requirement that *all* student groups accept *all* comers is textbook viewpoint neutral. Pp. 28–29.

(2) Conceding that the policy is nominally neutral, CLS asserts

that it systematically—and impermissibly—burdens most heavily those groups whose viewpoints are out of favor with the campus mainstream. This argument fails because "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791. Hastings' requirement that RSOs accept all comers, the Court is satisfied, is "justified without reference to the content [or viewpoint] of the regulated speech." *Id.,* at 791. It targets the *act* of rejecting would-be group members without reference to the reasons motivating that behavior. Pp. 29–31.

    3. Neither lower court addressed CLS's argument that Hastings selectively enforces its all-comers policy. This Court is not the proper forum to air the issue in the first instance. On remand, the Ninth Circuit may consider this argument if, and to the extent, it is preserved. Pp. 31–32.

319 Fed. Appx. 645, affirmed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, BREYER, and SOTOMAYOR, JJ., joined. STEVENS, J., and KENNEDY, J., filed concurring opinions. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1371

CHRISTIAN LEGAL SOCIETY CHAPTER OF THE UNI-
VERSITY OF CALIFORNIA, HASTINGS COLLEGE OF
THE LAW, AKA HASTINGS CHRISTIAN FELLOW-
SHIP, PETITIONER *v.* LEO P. MARTINEZ ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2010]

JUSTICE GINSBURG delivered the opinion of the Court.

In a series of decisions, this Court has emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Widmar* v. *Vincent*, 454 U. S. 263 (1981); *Healy* v. *James*, 408 U. S. 169 (1972). This case concerns a novel question regarding student activities at public universities: May a public law school condition its official recognition of a student group—and the attendant use of school funds and facilities—on the organization's agreement to open eligibility for membership and leadership to all students?

In the view of petitioner Christian Legal Society (CLS), an accept-all-comers policy impairs its First Amendment rights to free speech, expressive association, and free exercise of religion by prompting it, on pain of relinquishing the advantages of recognition, to accept members who

do not share the organization's core beliefs about religion and sexual orientation. From the perspective of respondent Hastings College of the Law (Hastings or the Law School), CLS seeks special dispensation from an across-the-board open-access requirement designed to further the reasonable educational purposes underpinning the school's student-organization program.

In accord with the District Court and the Court of Appeals, we reject CLS's First Amendment challenge. Compliance with Hastings' all-comers policy, we conclude, is a reasonable, viewpoint-neutral condition on access to the student-organization forum. In requiring CLS—in common with all other student organizations—to choose between welcoming all students and forgoing the benefits of official recognition, we hold, Hastings did not transgress constitutional limitations. CLS, it bears emphasis, seeks not parity with other organizations, but a preferential exemption from Hastings' policy. The First Amendment shields CLS against state prohibition of the organization's expressive activity, however exclusionary that activity may be. But CLS enjoys no constitutional right to state subvention of its selectivity.

I

Founded in 1878, Hastings was the first law school in the University of California public-school system. Like many institutions of higher education, Hastings encourages students to form extracurricular associations that "contribute to the Hastings community and experience." App. 349. These groups offer students "opportunities to pursue academic and social interests outside of the classroom [to] further their education" and to help them "develo[p] leadership skills." *Ibid.*

Through its "Registered Student Organization" (RSO) program, Hastings extends official recognition to student groups. Several benefits attend this school-approved

status. RSOs are eligible to seek financial assistance from
the Law School, which subsidizes their events using funds
from a mandatory student-activity fee imposed on all
students. *Id.,* at 217. RSOs may also use Law-School
channels to communicate with students: They may place
announcements in a weekly Office-of-Student-Services
newsletter, advertise events on designated bulletin boards,
send e-mails using a Hastings-organization address, and
participate in an annual Student Organizations Fair
designed to advance recruitment efforts. *Id.,* at 216–219.
In addition, RSOs may apply for permission to use the
Law School's facilities for meetings and office space. *Id.,*
at 218–219. Finally, Hastings allows officially recognized
groups to use its name and logo. *Id.,* at 216.

In exchange for these benefits, RSOs must abide by
certain conditions. Only a "non-commercial organization
whose membership is limited to Hastings students may
become [an RSO]." App. to Pet. for Cert. 83a. A prospec-
tive RSO must submit its bylaws to Hastings for approval,
*id.,* at 83a–84a; and if it intends to use the Law School's
name or logo, it must sign a license agreement, App. 219.
Critical here, all RSOs must undertake to comply with
Hastings' "Policies and Regulations Applying to College
Activities, Organizations and Students." *Ibid.*[1]

The Law School's Policy on Nondiscrimination (Nondis-
crimination Policy), which binds RSOs, states:

> "[Hastings] is committed to a policy against legally
> impermissible, arbitrary or unreasonable discrimina-
> tory practices. All groups, including administration,
> faculty, student governments, [Hastings]-owned stu-
> dent residence facilities and programs sponsored by
> [Hastings], are governed by this policy of nondis-

───────────

[1] These policies and regulations address a wide range of matters, for
example, alcoholic beverages at campus events, bake sales, and blood
drives. App. 246.

crimination.   [Hasting's] policy on nondiscrimination
is to comply fully with applicable law.
    "[Hastings] shall not discriminate unlawfully on the
basis of race, color, religion, national origin, ancestry,
disability, age, sex or sexual orientation.  This nondis-
crimination  policy  covers  admission,  access  and
treatment in Hastings-sponsored programs and activi-
ties."  *Id.,* at 220.

    Hastings interprets the Nondiscrimination Policy, as it
relates to the RSO program, to mandate acceptance of all
comers: School-approved groups must "allow any student
to participate, become a member, or seek leadership posi-
tions in the organization, regardless of [her] status or
beliefs."  *Id.,* at 221.[2]  Other law schools have adopted
similar all-comers policies.  See, *e.g.,* Georgetown Univer-
sity Law Center, Office of Student Life: Student Organi
zations,   available   at   http://www.law.georgetown.edu/
StudentLife/StudentOrgs/NewGroup.htm   (All   Internet

_____

    [2] "Th[is] policy," Hastings clarifies, "does not foreclose neutral and
generally applicable membership requirements unrelated to 'status or
beliefs.'"   Brief for Hastings 5.  So long as all students have the *oppor-
tunity* to participate on equal terms, RSOs may require them, *inter alia*,
to pay dues, maintain good attendance, refrain from gross misconduct,
or pass a skill-based test, such as the writing competitions adminis-
tered by law journals.  See *ibid.*  The dissent trumpets these neutral,
generally applicable membership requirements, arguing that, in truth,
Hastings has a "some-comers," not an all-comers, policy.  *Post*, at 2, 3,
8–9, 10, 23–24, 32–33 (opinion of ALITO, J.).   Hastings' open-access
policy, however, requires only that student organizations open eligibil-
ity for membership and leadership regardless of a student's status or
beliefs; dues, attendance, skill measurements, and comparable uni-
formly applied standards are fully compatible with the policy.   The
dissent makes much of Hastings' observation that groups have imposed
"even conduct requirements."  *Post*, at 9, 23–24.  But the very example
Hastings cites leaves no doubt that the Law School was referring to
boilerplate good-behavior standards, *e.g.,* "[m]embership may cease . . .
if the member is found to be involved in gross misconduct," App. 173
(cited in Brief for Hastings 5).

materials as visited June 24, 2010, and included in Clerk of Court's case file) (Membership in registered groups must be "open to all students."); Hofstra Law School Student Handbook 2009–2010, p. 49, available at http://law.hofstra.edu/pdf/StudentLife/StudentAffairs/Handbook/stuhb_handbook.pdf ("[Student] organizations are open to all students."). From Hastings' adoption of its Nondiscrimination Policy in 1990 until the events stirring this litigation, "no student organization at Hastings . . . ever sought an exemption from the Policy." App. 221.

In 2004, CLS became the first student group to do so. At the beginning of the academic year, the leaders of a predecessor Christian organization—which had been an RSO at Hastings for a decade—formed CLS by affiliating with the national Christian Legal Society (CLS-National). *Id.,* at 222–223, 225. CLS-National, an association of Christian lawyers and law students, charters student chapters at law schools throughout the country. *Id.,* at 225. CLS chapters must adopt bylaws that, *inter alia*, require members and officers to sign a "Statement of Faith" and to conduct their lives in accord with prescribed principles. *Id.,* at 225–226; App. to Pet. for Cert. 101a.[3] Among those tenets is the belief that sexual activity should not occur outside of marriage between a man and a woman; CLS thus interprets its bylaws to exclude from affiliation anyone who engages in "unrepentant homosex-

_____

[3] The Statement of Faith provides:

"Trusting in Jesus Christ as my Savior, I believe in:

• One God, eternally existent in three persons, Father, Son and Holy Spirit.

• God the Father Almighty, Maker of heaven and earth.

• The Deity of our Lord, Jesus Christ, God's only Son conceived of the Holy Spirit, born of the virgin Mary; His vicarious death for our sins through which we receive eternal life; His bodily resurrection and personal return.

• The presence and power of the Holy Spirit in the work of regeneration.

• The Bible as the inspired Word of God." App. 226.

ual conduct." App. 226. CLS also excludes students who
hold religious convictions different from those in the
Statement of Faith. *Id.,* at 227.

On September 17, 2004, CLS submitted to Hastings an
application for RSO status, accompanied by all required
documents, including the set of bylaws mandated by CLS-
National. *Id.,* at 227–228. Several days later, the Law
School rejected the application; CLS's bylaws, Hastings
explained, did not comply with the Nondiscrimination
Policy because CLS barred students based on religion and
sexual orientation. *Id.,* at 228.

CLS formally requested an exemption from the Nondis-
crimination Policy, *id.,* at 281, but Hastings declined to
grant one. "[T]o be one of our student-recognized organi-
zations," Hastings reiterated, "CLS must open its mem-
bership to all students irrespective of their religious be-
liefs or sexual orientation." *Id.,* at 294. If CLS instead
chose to operate outside the RSO program, Hastings
stated, the school "would be pleased to provide [CLS] the
use of Hastings facilities for its meetings and activities."
*Ibid.* CLS would also have access to chalkboards and
generally available campus bulletin boards to announce its
events. *Id.,* at 219, 233. In other words, Hastings would
do nothing to suppress CLS's endeavors, but neither would
it lend RSO-level support for them.

Refusing to alter its bylaws, CLS did not obtain RSO
status. It did, however, operate independently during the
2004–2005 academic year. CLS held weekly Bible-study
meetings and invited Hastings students to Good Friday
and Easter Sunday church services. *Id.,* at 229. It also
hosted a beach barbeque, Thanksgiving dinner, campus
lecture on the Christian faith and the legal practice, sev-
eral fellowship dinners, an end-of-year banquet, and other
informal social activities. *Ibid.*

On October 22, 2004, CLS filed suit against various
Hastings officers and administrators under 42 U. S. C.

§1983. Its complaint alleged that Hastings' refusal to grant the organization RSO status violated CLS's First and Fourteenth Amendment rights to free speech, expressive association, and free exercise of religion. The suit sought injunctive and declaratory relief.[4]

On cross-motions for summary judgment, the U. S. District Court for the Northern District of California ruled in favor of Hastings. The Law School's all-comers condition on access to a limited public forum, the court held, was both reasonable and viewpoint neutral, and therefore did not violate CLS's right to free speech. App. to Pet. for Cert. 27a–38a.

Nor, in the District Court's view, did the Law School impermissibly impair CLS's right to expressive association. "Hastings is not directly ordering CLS to admit [any] studen[t]," the court observed, *id.,* at 42a; "[r]ather, Hastings has merely placed conditions on" the use of its facilities and funds, *ibid.* "Hastings' denial of official recognition," the court added, "was not a substantial impediment to CLS's ability to meet and communicate as a group." *Id.,* at 49a.

The court also rejected CLS's Free Exercise Clause argument. "[T]he Nondiscrimination Policy does not target or single out religious beliefs," the court noted; rather, the policy "is neutral and of general applicability." *Id.,* at 63a. "CLS may be motivated by its religious beliefs to exclude students based on their religion or sexual orientation," the court explained, "but that does not convert the reason for Hastings' [Nondiscrimination Policy] to be one that is religiously-based." *Id.,* at 63a–64a.

On appeal, the Ninth Circuit affirmed in an opinion that stated, in full:

————————

[4] The District Court allowed respondent Hastings Outlaw, an RSO committed to "combating discrimination based on sexual orientation," *id.*, at 97, to intervene in the suit, *id.,* at 104.

"The parties stipulate that Hastings imposes an open membership rule on all student groups—all groups must accept all comers as voting members even if those individuals disagree with the mission of the group. The conditions on recognition are therefore viewpoint neutral and reasonable. *Truth v. Kent Sch. Dist.*, 542 F. 3d 634, 649–50 (9th Cir. 2008)." *Christian Legal Soc. Chapter of Univ. of Cal.* v. *Kane*, 319 Fed. Appx. 645, 645–646 (CA9 2009).

We granted certiorari, 558 U. S. ____ (2009), and now affirm the Ninth Circuit's judgment.

## II

Before considering the merits of CLS's constitutional arguments, we must resolve a preliminary issue: CLS urges us to review the Nondiscrimination Policy as written—prohibiting discrimination on several enumerated bases, including religion and sexual orientation—and not as a requirement that all RSOs accept all comers. The written terms of the Nondiscrimination Policy, CLS contends, "targe[t] solely those groups whose beliefs are based on religion or that disapprove of a particular kind of sexual behavior," and leave other associations free to limit membership and leadership to individuals committed to the group's ideology. Brief for Petitioner 19 (internal quotation marks omitted). For example, "[a] political . . . group can insist that its leaders support its purposes and beliefs," CLS alleges, but "a religious group cannot." *Id.,* at 20.

CLS's assertion runs headlong into the stipulation of facts it jointly submitted with Hastings at the summary-judgment stage. In that filing, the parties specified:

"Hastings requires that registered student organizations allow *any* student to participate, become a member, or seek leadership positions in the organization,

regardless of [her] status or beliefs. Thus, for example, the Hastings Democratic Caucus cannot bar students holding Republican political beliefs from becoming members or seeking leadership positions in the organization." App. 221 (Joint Stipulation ¶18) (emphasis added; citations omitted).[5]

Under the District Court's local rules, stipulated facts are deemed "undisputed." Civil Local Rule 56–2 (ND Cal. 2010). See also Pet. for Cert. 2 ("The material facts of this case are undisputed.").[6]

_____

[5] In its briefs before the District Court and the Court of Appeals, CLS several times affirmed that Hastings imposes an all-comers rule on RSOs. See, *e.g.,* Plaintiff's Notice of Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment in No. C 04 4484 JSW (ND Cal.), p. 4 ("Hastings interprets the [Nondiscrimination Policy] such that student organizations must allow *any* student, regardless of their status or beliefs, to participate in the group's activities and meetings and to become voting members and leaders of the group."); Brief for Appellant in No. 06–15956 (CA9), pp. 29–30 ("Hastings illustrates the application of the Nondiscrimination Policy by explaining that for the Hastings Democratic Caucus to gain recognition, it must open its leadership and voting membership to Republicans."). In a hearing before the District Court, CLS's counsel reiterated that "it's important to understand what Hastings' policy is. According to . . . the stipulated facts, Hastings requires . . . that registered student organizations allow any student to participate, become a member or seek leadership positions in the organization regardless of their status or beliefs." App. 438 (capitalization and internal quotation marks omitted). And at oral argument in this Court, counsel for CLS acknowledged that "the Court needs to reach the constitutionality *of the all-comers policy* as applied to CLS in this case." Tr. of Oral Arg. 59 (emphasis added). We repeat, in this regard, that Hastings' all-comers policy is hardly novel. Other law schools have adopted similar requirements. See *supra*, at 4–5; Brief for Association of American Law Schools as *Amicus Curiae* 20, n. 5.

[6] The dissent spills considerable ink attempting to create uncertainty about when the all-comers policy was adopted. See *post*, at 2, 3, 5, 6, 7, 8, 10, 11. What counts, however, is the parties' unqualified agreement that the all-comers policy *currently* governs. CLS's suit, after all, seeks only declaratory and injunctive—that is, prospective—relief. See App.

Litigants, we have long recognized, "[a]re entitled to have [their] case tried upon the assumption that . . . facts, stipulated into the record, were established." *H. Hackfeld & Co.* v. *United States*, 197 U. S. 442, 447 (1905).[7] This entitlement is the bookend to a party's undertaking to be bound by the factual stipulations it submits. See *post*, at 10 (ALITO, J., dissenting) (agreeing that "the parties must be held to their Joint Stipulation"). As a leading legal reference summarizes:

> "[Factual stipulations are] binding and conclusive . . . , and the facts stated are not subject to subsequent variation. So, the parties will not be permitted to deny the truth of the facts stated, . . . or to maintain a contention contrary to the agreed statement, . . . or to suggest, on appeal, that the facts were other than as stipulated or that any material fact was omitted. The burden is on the party seeking to recover to show his or her right from the facts actually stated." 83 C. J. S., Stipulations §93 (2000) (footnotes omitted).

This Court has accordingly refused to consider a party's argument that contradicted a joint "stipulation [entered] at the outset of th[e] litigation." *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 226 (2000).

––––––––––

80 (First Amended Verified Complaint for Declaratory and Injunctive Relief).

  [7] Record evidence, moreover, corroborates the joint stipulation concerning Hastings' all-comers policy. The Law School's then-Chancellor and Dean testified, for example, that "in order to be a registered student organization you have to allow all of our students to be members and full participants if they want to." App. 343. Hastings' Director of Student Services confirmed that RSOs must "be open to all students"— "even to students who may disagree with [an RSO's] purposes." *Id.,* at 320 (internal quotation marks omitted). See also *id.,* at 349 ("Hastings interprets the Nondiscrimination Policy as requiring that student organizations wishing to register with Hastings allow any Hastings student to become a member and/or seek a leadership position in the organization.").

Time and again, the dissent races away from the facts to which CLS stipulated. See, *e.g., post*, at 2, 3, 5, 6, 7, 8, 11, 24.[8] But factual stipulations are "formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission . . . is conclusive in the case." 2 K. Broun, McCormick on Evidence §254, p. 181 (6th ed. 2006) (footnote omitted). See also, *e.g., Oscanyan* v. *Arms Co.*, 103 U. S. 261, 263 (1881) ("The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced.").[9]

In light of the joint stipulation, both the District Court and the Ninth Circuit trained their attention on the constitutionality of the all-comers requirement, as described in the parties' accord. See 319 Fed. Appx., at 645–646; App. to Pet. for Cert. 32a; *id.,* at 36a. We reject CLS's unseemly attempt to escape from the stipulation and shift

———————

[8] In an effort to undermine the stipulation, the dissent emphasizes a sentence in Hastings' answer to CLS's first amended complaint which, the dissent contends, casts doubt on Hastings' fidelity to its all-comers policy. See *post*, at 5–6, 11. In context, Hastings' answer—which responded to CLS's allegation that the Law School singles out religious groups for discriminatory treatment—is sensibly read to convey that Hastings' policies and regulations apply to all groups equally. See App. 79 (denying that the Nondiscrimination Policy imposes on religious organizations restraints that are not applied to political, social, and cultural groups). In any event, the parties' joint stipulation supersedes the answer, to the extent of any conflict between the two filings. See *Pepper & Tanner, Inc.* v. *Shamrock Broadcasting, Inc.*, 563 F. 2d 391, 393 (CA9 1977) (Parties' "stipulation of facts . . . superseded all prior pleadings and controlled the subsequent course of the action.").

[9] The dissent indulges in make-believe when it suggests that we are making factual findings about Hastings' all-comers policy. *Post*, at 1, 2. As CLS's petition for certiorari stressed, "*[t]he material facts of this case are undisputed.*" Pet. for Cert. 2 (emphasis added). We take the facts as the joint stipulation describes them, see *supra*, at 8–11; our decision respects, while the dissent ignores, the conclusive effect of the parties' accord.

its target to Hastings' policy as written.  This opinion, therefore, considers only whether conditioning access to a student-organization forum on compliance with an all-comers policy violates the Constitution.[10]

## III
### A

In support of the argument that Hastings' all-comers policy treads on its First Amendment rights to free speech and expressive association, CLS draws on two lines of decisions.  First, in a progression of cases, this Court has employed forum analysis to determine when a governmental entity, in regulating property in its charge, may place limitations on speech.[11]  Recognizing a State's right "to preserve the property under its control for the use to which it is lawfully dedicated," *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 800 (1985) (inter-

---

[10] The dissent, in contrast, devotes considerable attention to CLS's arguments about the Nondiscrimination Policy as written.  *Post*, at 2, 3, 5, 18–23.  We decline to address these arguments, not because we agree with the dissent that the Nondiscrimination Policy is "plainly" unconstitutional, *post*, at 18, but because, as noted, *supra*, at 8–12, that constitutional question is not properly presented.

[11] In conducting forum analysis, our decisions have sorted government property into three categories.  First, in traditional public forums, such as public streets and parks, "any restriction based on the content of . . . speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City* v. *Summum*, 555 U. S. ___ (2009) (slip op., at 6). Second, governmental entities create designated public forums when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose"; speech restrictions in such a forum "are subject to the same strict scrutiny as restrictions in a traditional public forum." *Id.,* at ___ (slip op., at 7). Third, governmental entities establish limited public forums by opening property "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Ibid.*  As noted in text, "[i]n such a forum, a governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral." *Ibid.*

nal quotation marks omitted), the Court has permitted restrictions on access to a limited public forum, like the RSO program here, with this key caveat: Any access barrier must be reasonable and viewpoint neutral, *e.g., Rosenberger*, 515 U. S., at 829. See also, *e.g., Good News Club* v. *Milford Central School*, 533 U. S. 98, 106–107 (2001); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 392–393 (1993); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 46 (1983).[12]

Second, as evidenced by another set of decisions, this Court has rigorously reviewed laws and regulations that constrain associational freedom. In the context of public accommodations, we have subjected restrictions on that freedom to close scrutiny; such restrictions are permitted only if they serve "compelling state interests" that are "unrelated to the suppression of ideas"—interests that cannot be advanced "through . . . significantly less restrictive [means]." *Roberts* v. *United States Jaycees*, 468 U. S. 609, 623 (1984). See also, *e.g., Boy Scouts of America* v. *Dale*, 530 U. S. 640, 648 (2000). "Freedom of association," we have recognized, "plainly presupposes a freedom not to associate." *Roberts*, 468 U. S., at 623. Insisting that an organization embrace unwelcome members, we have therefore concluded, "directly and immediately affects associational rights." *Dale*, 530 U. S., at 659.

CLS would have us engage each line of cases independently, but its expressive-association and free-speech arguments merge: *Who* speaks on its behalf, CLS reasons, colors *what* concept is conveyed. See Brief for Petitioner 35 (expressive association in this case is "the functional

---

[12] Our decisions make clear, and the parties agree, that Hastings, through its RSO program, established a limited public forum. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995); Tr. of Oral Arg. 24 (counsel for CLS); Brief for Petitioner 25–26; Brief for Hastings 27–28; Brief for Hastings Outlaw 27.

equivalent of speech itself"). It therefore makes little sense to treat CLS's speech and association claims as discrete. See *Citizens Against Rent Control / Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 300 (1981). Instead, three observations lead us to conclude that our limited-public-forum precedents supply the appropriate framework for assessing both CLS's speech and association rights.

First, the same considerations that have led us to apply a less restrictive level of scrutiny to speech in limited public forums as compared to other environments, see *supra*, at 12–13, and n. 11, apply with equal force to expressive association occurring in limited public forums. As just noted, speech and expressive-association rights are closely linked. See *Roberts*, 468 U. S., at 622 (Associational freedom is "implicit in the right to engage in activities protected by the First Amendment."). When these intertwined rights arise in exactly the same context, it would be anomalous for a restriction on speech to survive constitutional review under our limited-public-forum test only to be invalidated as an impermissible infringement of expressive association. Accord Brief for State Universities and State University Systems as *Amici Curiae* 37–38. That result would be all the more anomalous in this case, for CLS suggests that its expressive-association claim plays a part auxiliary to speech's starring role. See Brief for Petitioner 18.

Second, and closely related, the strict scrutiny we have applied in some settings to laws that burden expressive association would, in practical effect, invalidate a defining characteristic of limited public forums—the State may "reserv[e] [them] for certain groups." *Rosenberger*, 515 U. S., at 829. See also *Perry Ed. Assn.*, 460 U. S., at 49 ("Implicit in the concept" of a limited public forum is the State's "right to make distinctions in access on the basis of . . . speaker identity."); *Cornelius*, 473 U. S., at 806 ("[A]

speaker may be excluded from" a limited public forum "if he is not a member of the class of speakers for whose especial benefit the forum was created.").

An example sharpens the tip of this point: Schools, including Hastings, see App. to Pet. for Cert. 83a, ordinarily, and without controversy, limit official student-group recognition to organizations comprising only students—even if those groups wish to associate with nonstudents. See, *e.g.*, Volokh, Freedom of Expressive Association and Government Subsidies, 58 Stan. L. Rev. 1919, 1940 (2006). The same ground rules must govern both speech and association challenges in the limited-public-forum context, lest strict scrutiny trump a public university's ability to "confin[e] a [speech] forum to the limited and legitimate purposes for which it was created." *Rosenberger*, 515 U. S., at 829. See also *Healy*, 408 U. S., at 189 ("Associational activities need not be tolerated where they infringe reasonable campus rules.").

Third, this case fits comfortably within the limited-public-forum category, for CLS, in seeking what is effectively a state subsidy, faces only indirect pressure to modify its membership policies; CLS may exclude any person for any reason if it forgoes the benefits of official recognition.[13] The expressive-association precedents on which CLS relies, in contrast, involved regulations that *compelled* a group to include unwanted members, with no choice to opt out. See, *e.g., Dale*, 530 U. S., at 648 (regulation "forc[ed] [the Boy Scouts] to accept members it [did] not desire" (internal quotation marks omitted)); *Roberts*,

———————

[13] The fact that a university "expends funds to encourage a diversity of views from private speakers," this Court has held, does not justify it in "discriminat[ing] based on the viewpoint of private persons whose speech it facilitates." *Rosenberger*, 515 U. S., at 834. Applying limited-public-forum analysis (which itself prohibits viewpoint discrimination) to CLS's expressive association claim, we emphasize, does not upset this principle.

468 U. S., at 623 ("There can be no clearer example of an intrusion into the internal structure or affairs of an association than" forced inclusion of unwelcome participants.).[14]

In diverse contexts, our decisions have distinguished between policies that require action and those that withhold benefits. See, *e.g.*, *Grove City College* v. *Bell*, 465 U. S. 555, 575–576 (1984); *Bob Jones Univ.* v. *United States*, 461 U. S. 574, 602–604 (1983). Application of the less-restrictive limited-public-forum analysis better accounts for the fact that Hastings, through its RSO program, is dangling the carrot of subsidy, not wielding the stick of prohibition. Cf. *Norwood* v. *Harrison*, 413 U. S. 455, 463 (1973) ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.").

In sum, we are persuaded that our limited-public-forum precedents adequately respect both CLS's speech and expressive-association rights, and fairly balance those rights against Hastings' interests as property owner and educational institution. We turn to the merits of the

---

[14] CLS also brackets with expressive-association precedents our decision in *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995). There, a veterans group sponsoring a St. Patrick's Day parade challenged a state law requiring it to allow gay individuals to march in the parade behind a banner celebrating their Irish heritage and sexual orientation. *Id.,* at 572. In evaluating that challenge, the *Hurley* Court focused on the veterans group's interest in controlling the message conveyed by the organization. See *id.,* at 573–581. Whether *Hurley* is best conceptualized as a speech or association case (or both), however, that precedent is of little help to CLS. *Hurley* involved the application of a statewide public-accommodations law to the most traditional of public forums: the street. That context differs markedly from the limited public forum at issue here: a university's application of an all-comers policy to its student-organization program.

instant dispute, therefore, with the limited-public-forum decisions as our guide.

## B

As earlier pointed out, *supra*, at 1, 12–13, we do not write on a blank slate; we have three times before considered clashes between public universities and student groups seeking official recognition or its attendant benefits. First, in *Healy*, a state college denied school affiliation to a student group that wished to form a local chapter of Students for a Democratic Society (SDS). 408 U. S., at 170. Characterizing SDS's mission as violent and disruptive, and finding the organization's philosophy repugnant, the college completely banned the SDS chapter from campus; in its effort to sever all channels of communication between students and the group, university officials went so far as to disband a meeting of SDS members in a campus coffee shop. *Id.,* at 174–176. The college, we noted, could require "that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law," including "reasonable standards respecting conduct." *Id.,* at 193. But a public educational institution exceeds constitutional bounds, we held, when it "restrict[s] speech or association simply because it finds the views expressed by [a] group to be abhorrent." *Id.,* at 187–188.[15]

---

[15] The dissent relies heavily on *Healy*, *post*, at 13–17, but its otherwise exhaustive account of the case elides the very fact the *Healy* Court identified as dispositive: The president of the college explicitly denied the student group official recognition *because of* the group's viewpoint. See 408 U. S, at 187 ("The mere disagreement of the President with the group's philosophy affords no reason to deny it recognition."). In this case, in contrast, Hastings denied CLS recognition not because the school wanted to silence the "viewpoint that CLS sought to express through its membership requirements," *post*, at 17, n. 2, but because CLS, insisting on preferential treatment, declined to comply with the open-access policy applicable to all RSOs, see *R. A. V.* v. *St. Paul*, 505 U. S. 377, 390 (1992) ("Where the [State] does not target conduct on the

We later relied on *Healy* in *Widmar*.  In that case, a public university, in an effort to avoid state support for religion, had closed its facilities to a registered student group that sought to use university space for religious worship and discussion.  454 U. S., at 264–265.  "A university's mission is education," we observed, "and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."  *Id.,* at 268, n. 5.  But because the university singled out religious organizations for disadvantageous treatment, we subjected the university's regulation to strict scrutiny.  *Id.,* at 269–270.  The school's interest "in maintaining strict separation of church and State," we held, was not "sufficiently compelling to justify . . . [viewpoint] discrimination against . . . religious speech."  *Id.,* at 270, 276 (internal quotation marks omitted).

Most recently and comprehensively, in *Rosenberger*, we reiterated that a university generally may not withhold benefits from student groups because of their religious outlook.  The officially recognized student group in *Rosenberger* was denied student-activity-fee funding to distrib-

—————

basis of its expressive content, *acts* are not shielded from regulation *merely because they express a discriminatory . . . philosophy*." (emphasis added)).  As discussed *infra*, at 28–31, Hastings' all-comers policy is paradigmatically viewpoint neutral.  The dissent's contention that "the identity of the student group" is the only "way of distinguishing *Healy*," *post*, at 16, is thus untenable.

The dissent's description of *Healy* also omits the *Healy* Court's observation that "[a] college administration may . . . requir[e] . . . that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law.  Such a requirement does not impose an impermissible condition on the students' associational rights. . . .  It merely constitutes an agreement to conform with reasonable standards respecting conduct. . . .  [T]he benefits of participation in the internal life of the college community may be denied to any group that reserves the right to violate any valid campus rules with which it disagrees."  408 U. S., at 193–194.

ute a newspaper because the publication discussed issues
from a Christian perspective. 515 U. S., at 825–827. By
"select[ing] for disfavored treatment those student journal-
istic efforts with religious editorial viewpoints," we held,
the university had engaged in "viewpoint discrimination,
which is presumed impermissible when directed against
speech otherwise within the forum's limitations." *Id.,* at
831, 830.

In all three cases, we ruled that student groups had
been unconstitutionally singled out because of their points
of view. "Once it has opened a limited [public] forum," we
emphasized, "the State must respect the lawful bounda-
ries it has itself set." *Id.,* at 829. The constitutional con-
straints on the boundaries the State may set bear repeti-
tion here: "The State may not exclude speech where its
distinction is not reasonable in light of the purpose served
by the forum, . . . nor may it discriminate against speech
on the basis of . . . viewpoint." *Ibid.* (internal quotation
marks omitted).

## C

We first consider whether Hastings' policy is reasonable
taking into account the RSO forum's function and "all the
surrounding circumstances." *Cornelius*, 473 U. S., at 809.

### 1

Our inquiry is shaped by the educational context in
which it arises: "First Amendment rights," we have ob-
served, "must be analyzed in light of the special character-
istics of the school environment." *Widmar*, 454 U. S., at
268, n. 5 (internal quotation marks omitted). This Court
is the final arbiter of the question whether a public uni-
versity has exceeded constitutional constraints, and we
owe no deference to universities when we consider that
question. Cf. *Pell* v. *Procunier*, 417 U. S. 817, 827 (1974)
("Courts cannot, of course, abdicate their constitutional

responsibility to delineate and protect fundamental liber-
ties."). Cognizant that judges lack the on-the-ground
expertise and experience of school administrators, how-
ever, we have cautioned courts in various contexts to
resist "substitut[ing] their own notions of sound educa-
tional policy for those of the school authorities which they
review." *Board of Ed. of Hendrick Hudson Central School
Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176, 206
(1982). See also, *e.g., Hazelwood School Dist.* v. *Kuhl-
meier*, 484 U. S. 260, 273 (1988) (noting our "oft-expressed
view that the education of the Nation's youth is primarily
the responsibility of parents, teachers, and state and local
school officials, and not of federal judges"); *Healy*, 408
U. S., at 180 ("[T]his Court has long recognized 'the need
for affirming the comprehensive authority of the States
and of school officials, consistent with fundamental consti-
tutional safeguards, to prescribe and control conduct in
the schools.'" (quoting *Tinker* v. *Des Moines Independent
Community School Dist.*, 393 U. S. 503, 507 (1969))).

A college's commission—and its concomitant license to
choose among pedagogical approaches—is not confined to
the classroom, for extracurricular programs are, today,
essential parts of the educational process. See *Board of
Ed. of Independent School Dist. No. 92 of Pottawatomie
Cty.* v. *Earls*, 536 U. S. 822, 831, n. 4 (2002) (involvement
in student groups is "a significant contributor to the
breadth and quality of the educational experience" (inter-
nal quotation marks omitted)). Schools, we have empha-
sized, enjoy "a significant measure of authority over the
type of officially recognized activities in which their stu-
dents participate." *Board of Ed. of Westside Community
Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 240 (1990).
We therefore "approach our task with special caution,"
*Healy*, 408 U. S., at 171, mindful that Hastings' decisions
about the character of its student-group program are due

decent respect.[16]

2

With appropriate regard for school administrators' judgment, we review the justifications Hastings offers in defense of its all-comers requirement.[17] First, the open-access policy "ensures that the leadership, educational, and social opportunities afforded by [RSOs] are available

————————

[16] The dissent mischaracterizes the nature of the respect we accord to Hastings. See *post*, at 1, 15–16, 27. As noted *supra*, at 19–20, this Court, exercising its independent judgment, must "interpre[t] and appl[y] . . . the right to free speech." *Post*, at 16. But determinations of what constitutes sound educational policy or what goals a student-organization forum ought to serve fall within the discretion of school administrators and educators. See, *e.g., Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176, 206 (1982).

[17] Although the dissent maintains it is "content to address the constitutionality of Hastings' actions under our limited public forum cases," *post*, at 17, it resists the import of those cases at every turn. For example, although the dissent acknowledges that a university has the authority to set the boundaries of a limited public forum, *post*, at 17, 24, the dissent refuses to credit Hastings' all-comers policy as one of those boundaries. See *ibid.* (insisting that "Hastings' regulations . . . impose only two substantive limitations: A group . . . must have student members and must be non-commercial."). In short, "the design of the RSO forum," *post*, at 26, which the dissent discusses at length, *post*, at 24–31, is of its own tailoring.

Another example: The dissent pointedly observes that "[w]hile there can be no question that the State of California could not impose [an all-comers] restrictio[n] on all religious groups in the State, the Court now holds that Hastings, a state institution, may impose these very same requirements on students who wish to participate in a forum that is designed to foster the expression of diverse viewpoints." *Post*, at 27. As noted *supra*, at 12–13, and n. 11, this difference reflects the lesser standard of scrutiny applicable to limited public forums compared to other forums. The dissent fights the distinction between state *prohibition* and state *support*, but its real quarrel is with our limited public forum doctrine, which recognizes that distinction. CLS, it bears repetition, remains free to express whatever it will, but it cannot insist on an exemption from Hastings' embracive all-comers policy.

to all students."    Brief for Hastings 32; see Brief for
American Civil Liberties Union et al. as *Amici Curiae* 11.
Just as "Hastings does not allow its professors to host
classes open only to those students with a certain status or
belief," so the Law School may decide, reasonably in our
view, "that the . . . educational experience is best promoted
when all participants in the forum must provide equal
access to all students."    Brief for Hastings 32.    RSOs,
we count it significant, are eligible for financial assist-
ance drawn from mandatory student-activity fees, see
*supra*, at 3; the all-comers policy ensures that no Hastings
student is forced to fund a group that would reject her as a
member.[18]

Second, the all-comers requirement helps Hastings
police the written terms of its Nondiscrimination Policy
without inquiring into an RSO's motivation for member-
ship restrictions.  To bring the RSO program within CLS's
view of the Constitution's limits, CLS proposes that Hast-
ings permit exclusion because of *belief* but forbid discrimi-
nation due to *status*.  See Tr. of Oral Arg. 18.  But that
proposal would impose on Hastings a daunting labor.
How should the Law School go about determining whether
a student organization cloaked prohibited status exclusion
in belief-based garb?  If a hypothetical Male-Superiority
Club barred a female student from running for its presi-
dency, for example, how could the Law School tell whether
the group rejected her bid because of her sex or because,
by seeking to lead the club, she manifested a lack of belief
in its fundamental philosophy?

This case itself is instructive in this regard.  CLS con-
tends that it does not exclude individuals because of sex-

––––––––––
[18] CLS notes that its "activities—its Bible studies, speakers, and din-
ners—are open to all students," even if attendees are barred from
membership and leadership.  Reply Brief 20.  Welcoming all comers as
guests or auditors, however, is hardly equivalent to accepting all
comers as full-fledged participants.

ual orientation, but rather "on the basis of a conjunction of conduct and the belief that the conduct is not wrong." Brief for Petitioner 35–36 (emphasis deleted). Our decisions have declined to distinguish between status and conduct in this context. See *Lawrence* v. *Texas*, 539 U. S. 558, 575 (2003) ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination." (emphasis added)); *id.,* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class."); cf. *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). See also Brief for Lambda Legal Defense and Education Fund, Inc., et al. as *Amici Curiae* 7–20.

Third, the Law School reasonably adheres to the view that an all-comers policy, to the extent it brings together individuals with diverse backgrounds and beliefs, "encourages tolerance, cooperation, and learning among students." App. 349.[19] And if the policy sometimes produces discord, Hastings can rationally rank among RSO-program goals development of conflict-resolution skills, toleration, and readiness to find common ground.

Fourth, Hastings' policy, which incorporates—in fact, subsumes—state-law proscriptions on discrimination, conveys the Law School's decision "to decline to subsidize with public monies and benefits conduct of which the

―――――――

[19] CLS's predecessor organization, the Hastings Christian Fellowship (HCF), experienced these benefits first-hand when it welcomed an openly gay student as a member during the 2003–2004 academic year. That student, testified another HCF member, "was a joy to have" in the group and brought a unique perspective to Bible-study discussions. See App. 325, 327.

people of California disapprove." Brief for Hastings 35; *id.,* at 33–34 (citing Cal. Educ. Code §66270 (prohibiting discrimination on various bases)). State law, of course, may not *command* that public universities take action impermissible under the First Amendment. But so long as a public university does not contravene constitutional limits, its choice to advance state-law goals through the school's educational endeavors stands on firm footing.

In sum, the several justifications Hastings asserts in support of its all-comers requirement are surely reasonable in light of the RSO forum's purposes.[20]

3

The Law School's policy is all the more creditworthy in view of the "substantial alternative channels that remain open for [CLS-student] communication to take place." *Perry Ed. Assn.*, 460 U. S., at 53. If restrictions on access to a limited public forum are viewpoint discriminatory, the ability of a group to exist outside the forum would not cure the constitutional shortcoming. But when access barriers are viewpoint neutral, our decisions have counted it significant that other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers. See *ibid.*; *Cornelius*, 473 U. S., at 809; *Greer* v. *Spock*, 424 U. S. 828, 839 (1976); *Pell*, 417 U. S., at 827–828.

In this case, Hastings offered CLS access to school facilities to conduct meetings and the use of chalkboards and generally available bulletin boards to advertise events. App. 232–233. Although CLS could not take advantage of RSO-specific methods of communication, see *supra*, at 3, the advent of electronic media and social-networking sites reduces the importance of those channels. See App. 114–

---

[20] Although the Law School has offered multiple justifications for its all-comers policy, we do not suggest that each of them is necessary for the policy to survive constitutional review.

115 (CLS maintained a Yahoo! message group to disseminate information to students.); *Christian Legal Society* v. *Walker,* 453 F. 3d 853, 874 (CA7 2006) (Wood, J., dissenting) ("Most universities and colleges, and most college-aged students, communicate through email, websites, and hosts like MySpace . . . . If CLS had its own website, any student at the school with access to Google—that is, all of them—could easily have found it."). See also Brief for Associated Students of the University of California, Hastings College of Law as *Amicus Curiae* 14–18 (describing host of ways CLS could communicate with Hastings' students outside official channels).

Private groups, from fraternities and sororities to social clubs and secret societies, commonly maintain a presence at universities without official school affiliation.[21] Based on the record before us, CLS was similarly situated: It hosted a variety of activities the year after Hastings denied it recognition, and the number of students attending those meetings and events doubled. App. 224, 229–230. "The variety and type of alternative modes of access present here," in short, "compare favorably with those in other [limited public] forum cases where we have upheld restrictions on access." *Perry Ed. Assn.*, 460 U. S., at 53–54. It is beyond dissenter's license, we note again, see *supra*, at 21, n. 17, constantly to maintain that nonrecognition of a student organization is equivalent to prohibiting its members from speaking.

---

[21] See, *e.g.*, Baker, Despite Lack of University Recognition, Pi Kappa Theta Continues to Grow, The New Hampshire, Sept. 28, 2009, pp. 1, 5 (unrecognized fraternity able to grow despite severed ties with the University of New Hampshire); Battey, Final Clubs Provide Controversial Social Outlet, Yale Daily News, Apr. 5, 2006, pp. 1, 4 (Harvard social clubs, known as "final clubs," "play a large role in the experience of . . . students" even though "they became completely disassociated from the university in 1984").

4

CLS nevertheless deems Hastings' all-comers policy "frankly absurd." Brief for Petitioner 49. "There can be no diversity of viewpoints in a forum," it asserts, "if groups are not permitted to form around viewpoints." *Id.,* at 50; accord *post*, at 25 (ALITO, J., dissenting). This catchphrase confuses CLS's preferred policy with constitutional limitation—the *advisability* of Hastings' policy does not control its *permissibility*. See *Wood* v. *Strickland*, 420 U. S. 308, 326 (1975). Instead, we have repeatedly stressed that a State's restriction on access to a limited public forum "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U. S., at 808.[22]

CLS also assails the reasonableness of the all-comers policy in light of the RSO forum's function by forecasting that the policy will facilitate hostile takeovers; if organizations must open their arms to all, CLS contends, saboteurs will infiltrate groups to subvert their mission and message. This supposition strikes us as more hypothetical than real. CLS points to no history or prospect of RSO-hijackings at Hastings. Cf. *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 584 (1998) ("[W]e are reluctant . . . to invalidate legislation on the basis of its hypothetical application to situations not before the Court." (internal quotation marks omitted)). Students tend to self-sort and presumably will not endeavor en masse to join—let alone

––––––––––

[22] CLS's concern, shared by the dissent, see *post*, at 25–26, that an all-comers policy will squelch diversity has not been borne out by Hastings' experience. In the 2004–2005 academic year, approximately 60 student organizations, representing a variety of interests, registered with Hastings, from the Clara Foltz Feminist Association, to the Environmental Law Society, to the Hastings Chinese Law and Culture Society. App. 215, 237–238. Three of these 60 registered groups had a religious orientation: Hastings Association of Muslim Law Students, Hastings Jewish Law Students Association, and Hastings Koinonia. *Id.*, at 215–216.

seek leadership positions in—groups pursuing missions wholly at odds with their personal beliefs. And if a rogue student intent on sabotaging an organization's objectives nevertheless attempted a takeover, the members of that group would not likely elect her as an officer.

RSOs, moreover, in harmony with the all-comers policy, may condition eligibility for membership and leadership on attendance, the payment of dues, or other neutral requirements designed to ensure that students join because of their commitment to a group's vitality, not its demise. See *supra*, at 4, n. 2. Several RSOs at Hastings limit their membership rolls and officer slates in just this way. See, *e.g.*, App. 192 (members must "[p]ay their dues on a timely basis" and "attend meetings regularly"); *id.*, at 173 (members must complete an application and pay dues; "[a]ny active member who misses a semester of regularly scheduled meetings shall be dropped from rolls"); App. to Pet. for Cert. 129a ("Only Hastings students who have held membership in this organization for a minimum of one semester shall be eligible to be an officer.").[23]

Hastings, furthermore, could reasonably expect more from its law students than the disruptive behavior CLS hypothesizes—and to build this expectation into its educational approach. A reasonable policy need not anticipate and preemptively close off every opportunity for avoidance or manipulation. If students begin to exploit an all-comers policy by hijacking organizations to distort or destroy their missions, Hastings presumably would revisit and revise its policy. See Tr. of Oral Arg. 41 (counsel for Hastings); Brief for Hastings 38.

Finally, CLS asserts (and the dissent repeats, *post*, at

---

[23] As Hastings notes, other "checks [are also] in place" to prevent RSO-sabotage. Brief for Hastings 43, n. 16. "The [Law] School's student code of conduct applies to RSO activities and, *inter alia*, prohibits obstruction or disruption, disorderly conduct, and threats." *Ibid.* (internal quotation marks and brackets omitted).

29) that the Law School lacks any legitimate interest—let alone one reasonably related to the RSO forum's purposes—in urging "religious groups not to favor co-religionists for purposes of their religious activities." Brief for Petitioner 43; *id.*, at 50. CLS's analytical error lies in focusing on the benefits it must forgo while ignoring the interests of those it seeks to fence out: Exclusion, after all, has two sides. Hastings, caught in the crossfire between a group's desire to exclude and students' demand for equal access, may reasonably draw a line in the sand permitting *all* organizations to express what they wish but *no* group to discriminate in membership.[24]

### D

We next consider whether Hastings' all-comers policy is viewpoint neutral.

### 1

Although this aspect of limited-public-forum analysis has been the constitutional sticking point in our prior decisions, as earlier recounted, *supra*, at 17–19, we need not dwell on it here. It is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers. In contrast to *Healy*, *Widmar*, and *Rosenberger*, in which universities singled out organizations for disfavored treatment because of their

---

[24] In arguing that the all-comers policy is not reasonable in light of the RSO forum's purposes, the dissent notes that Title VII, which prohibits employment discrimination on the basis of religion, among other categories, provides an exception for religious associations. *Post*, at 28, n. 8. The question here, however, is not whether Hastings *could*, consistent with the Constitution, provide religious groups dispensation from the all-comers policy by permitting them to restrict membership to those who share their faith. It is instead whether Hastings *must* grant that exemption. This Court's decision in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 878–882 (1990), unequivocally answers no to that latter question. See also *infra*, at 31, n. 27.

points of view, Hastings' all-comers requirement draws no distinction between groups based on their message or perspective. An all-comers condition on access to RSO status, in short, is textbook viewpoint neutral.[25]

### 2

Conceding that Hastings' all-comers policy is "nominally neutral," CLS attacks the regulation by pointing to its effect: The policy is vulnerable to constitutional assault, CLS contends, because "it systematically and predictably burdens most heavily those groups whose viewpoints are out of favor with the campus mainstream." Brief for Petitioner 51; cf. *post*, at 1 (ALITO, J., dissenting) (charging that Hastings' policy favors "political[ly] correc[t]" student expression). This argument stumbles from its first step because "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not

_____

[25] Relying exclusively on *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217 (2000), the dissent "would not be so quick to jump to th[e] conclusion" that the all-comers policy is viewpoint neutral. *Post*, at 31, and 31–32, n. 10. Careful consideration of *Southworth*, however, reveals how desperate the dissent's argument is. In *Southworth*, university students challenged a mandatory student-activity fee used to fund student groups. Finding the political and ideological speech of certain groups offensive, the student-challengers argued that imposition of the fee violated their First Amendment rights. 529 U. S., at 221. This Court upheld the university's choice to subsidize groups whose expression some students found distasteful, but we admonished that the university could not "prefer some viewpoints to others" in the distribution of funds. *Id.,* at 233. We cautioned that the university's referendum process, which allowed students to vote on whether a student organization would receive financial support, risked violation of this principle by allowing students to select groups to fund based on their viewpoints. *Id.,* at 235. In this case, in contrast, the all-comers policy governs *all* RSOs; Hastings does not pick and choose which organizations must comply with the policy on the basis of viewpoint. App. 221. *Southworth* accordingly provides no support for the dissent's warped analysis.

others." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791
(1989). See also *Madsen* v. *Women's Health Center, Inc.*,
512 U. S. 753, 763 (1994) ("[T]he fact that the injunction
covered people with a particular viewpoint does not itself
render the injunction content or viewpoint based.").

Even if a regulation has a differential impact on groups
wishing to enforce exclusionary membership policies,
"[w]here the [State] does not target conduct on the basis of
its expressive content, acts are not shielded from regula-
tion merely because they express a discriminatory idea or
philosophy." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 390
(1992). See also *Roberts*, 468 U. S., at 623 (State's nondis-
crimination law did not "distinguish between prohibited
and permitted activity on the basis of viewpoint."); *Board
of Directors of Rotary Int'l* v. *Rotary Club of Duarte*, 481
U. S. 537, 549 (1987) (same).

Hastings' requirement that student groups accept all
comers, we are satisfied, "is justified without reference to
the content [or viewpoint] of the regulated speech." *Ward*,
491 U. S., at 791 (internal quotation marks and emphasis
omitted). The Law School's policy aims at the *act* of reject-
ing would-be group members without reference to the
reasons motivating that behavior: Hastings' "desire to
redress th[e] perceived harms" of exclusionary member-
ship policies "provides an adequate explanation for its [all-
comers condition] over and above mere disagreement with
[any student group's] beliefs or biases." *Wisconsin* v.
*Mitchell*, 508 U. S. 476, 488 (1993). CLS's conduct—not
its Christian perspective—is, from Hastings' vantage
point, what stands between the group and RSO status.
"In the end," as Hastings observes, "CLS is simply confus-
ing its *own* viewpoint-based objections to . . . nondiscrimi-
nation laws (which it is entitled to have and [to] voice)
with viewpoint *discrimination*." Brief for Hastings 31.[26]

------

[26] Although registered student groups must conform their conduct to

Finding Hastings' open-access condition on RSO status reasonable and viewpoint neutral, we reject CLS' free-speech and expressive-association claims.[27]

## IV

In its reply brief, CLS contends that "[t]he peculiarity, incoherence, and suspect history of the all-comers policy all point to pretext." Reply Brief 23. Neither the District Court nor the Ninth Circuit addressed an argument that Hastings selectively enforces its all-comers policy, and this Court is not the proper forum to air the issue in the first instance.[28] On remand, the Ninth Circuit may consider

———————

the Law School's regulation by dropping access barriers, they may express any viewpoint they wish—including a discriminatory one. Cf. *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 60 (2006) ("As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*."). Today's decision thus continues this Court's tradition of "protect[ing] the freedom to express 'the thought that we hate.'" *Post*, at 1 (ALITO, J., dissenting) (quoting *United States* v. *Schwimmer*, 279 U. S. 644, 655 (1929) (Holmes, J., dissenting)).

[27] CLS briefly argues that Hastings' all-comers condition violates the Free Exercise Clause. Brief for Petitioner 40–41. Our decision in *Smith*, 494 U. S. 872, forecloses that argument. In *Smith*, the Court held that the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct. *Id.,* at 878–882. In seeking an exemption from Hastings' across-the-board all-comers policy, CLS, we repeat, seeks preferential, not equal, treatment; it therefore cannot moor its request for accommodation to the Free Exercise Clause.

[28] Finding the Ninth Circuit's analysis cursory, the dissent repeatedly urges us to resolve the pretext question. See, *e.g., post*, at 2, 31–35, and 17, n. 2. In doing so, the dissent forgets that "we are a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). When the lower courts have failed to address an argument that deserved their attention, our usual practice is to remand for further consideration, not to seize the opportunity to decide the question ourselves. That is especially true when we agree to review an issue on the understanding that "[t]he material facts . . . are undisputed," as

CLS's pretext argument if, and to the extent, it is preserved.[29]

\*    \*    \*

For the foregoing reasons, we affirm the Court of Appeals' ruling that the all-comers policy is constitutional and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

———————

CLS's petition for certiorari emphasized was the case here. Pet. for Cert. 2.

[29] The dissent's pretext discussion presents a one-sided summary of the record evidence, *post*, at 31–34, an account depending in large part on impugning the veracity of a distinguished legal scholar and a well respected school administrator, *post*, at 3, 5, 6, 7, 8, 9, 11, 24, 32, 34. See also *supra*, at 10, n. 7.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1371

_____

CHRISTIAN LEGAL SOCIETY CHAPTER OF THE UNI-
VERSITY OF CALIFORNIA, HASTINGS COLLEGE OF
THE LAW, AKA HASTINGS CHRISTIAN FELLOW-
SHIP, PETITIONER *v.* LEO P. MARTINEZ ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2010]

JUSTICE STEVENS, concurring.

The Court correctly confines its discussion to the narrow issue presented by the record, see *ante*, at 8–12, and correctly upholds the all-comers policy. I join its opinion without reservation. Because the dissent has volunteered an argument that the school's general Nondiscrimination Policy would be "plainly" unconstitutional if applied to this case, *post*, at 18 (opinion of ALITO, J.), a brief response is appropriate. In my view, both policies are plainly legitimate.

The Hastings College of Law's (Hastings) Nondiscrimination Policy contains boilerplate language used by institutions and workplaces across the country: It prohibits "unlawfu[l]" discrimination "on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation." App. 220. Petitioner, the Hastings chapter of the Christian Legal Society (CLS), refused to comply. As the Court explains, *ante*, at 5–6, CLS was unwilling to admit members unless they affirmed their belief in certain Christian doctrines and refrained from "participation in or advocacy of a sexually immoral life-style," App. 146. CLS, in short, wanted to receive the school's formal recognition—and the benefits that attend

formal recognition—while continuing to exclude gay and non-Christian students (as well as, it seems, students who advocate for gay rights).

In the dissent's view, by refusing to grant CLS an exemption from the Nondiscrimination Policy, Hastings violated CLS's rights, for by proscribing unlawful discrimination on the basis of religion, the policy discriminates unlawfully on the basis of religion. There are numerous reasons why this counterintuitive theory is unsound. Although the First Amendment may protect CLS's discriminatory practices off campus, it does not require a public university to validate or support them.

As written, the Nondiscrimination Policy is content and viewpoint neutral. It does not reflect a judgment by school officials about the substance of any student group's speech. Nor does it exclude any would-be groups on the basis of their convictions. Indeed, it does not regulate expression or belief at all. The policy is "directed at the organization's activities rather than its philosophy," *Healy* v. *James*, 408 U. S. 169, 188 (1972). Those who hold religious beliefs are not "singled out," *post*, at 19 (ALITO, J., dissenting); those who engage in discriminatory *conduct* based on someone else's religious status and belief are singled out.[1] Regardless of whether they are the product

———————

[1] The dissent appears to accept that Hastings may prohibit discrimination on the basis of religious *status*, though it rejects the notion that Hastings may do the same for religious *belief*. See, *e.g., post*, at 22, n. 5, 28. If CLS sought to exclude a Muslim student in virtue of the fact that he "is" Muslim, the dissent suggests, there would be no problem in Hastings forbidding that. But if CLS sought to exclude the same student in virtue of the fact that he subscribes to the Muslim faith, Hastings must stand idly by. This proposition is not only unworkable in practice but also flawed in conception. A person's religion often simultaneously constitutes or informs a status, an identity, a set of beliefs and practices, and much else besides. (So does sexual orientation for that matter, see *ante*, at 22–23, notwithstanding the dissent's view that a rule excluding those who engage in "unrepentant homosex-

of secular or spiritual feeling, hateful or benign motives, all acts of religious discrimination are equally covered. The discriminator's beliefs are simply irrelevant. There is, moreover, no evidence that the policy was adopted because of any reason related to the particular views that religious individuals or groups might have, much less because of a desire to suppress or distort those views. The policy's religion clause was plainly meant to promote, not to undermine, religious freedom.

To be sure, the policy may end up having greater consequence for religious groups—whether and to what extent it will is far from clear *ex ante*—inasmuch as they are more likely than their secular counterparts to wish to exclude students of particular faiths. But there is likewise no evidence that the policy was intended to cause harm to religious groups, or that it has in practice caused significant harm to their operations. And it is a basic tenet of First Amendment law that disparate impact does not, in itself, constitute viewpoint discrimination.[2] The dissent

_____

ual conduct," App. 226, does not discriminate on the basis of status or identity, *post*, at 22–23.) Our First Amendment doctrine has never required university administrators to undertake the impossible task of separating out belief-based from status-based religious discrimination.

[2] See, *e.g., Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 763 (1994); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 385 (1992); *Board of Directors of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U. S. 537, 549 (1987); *Roberts* v. *United States Jaycees*, 468 U. S. 609, 623, 628 (1984); cf. *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 878–879 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate"). Courts and commentators have applied this insight to the exact situation posed by the Nondiscrimination Policy. See, *e.g., Christian Legal Society* v. *Walker*, 453 F. 3d 853, 866 (CA7 2006) (stating that "[t]here can be little doubt that" comparable nondiscrimination policy "is viewpoint neutral on its face"); *Truth* v. *Kent School Dist.*, 542 F. 3d 634, 649–650 (CA9 2008) (similar); Volokh, Freedom of Expressive Association and Government Subsidies, 58 Stan. L. Rev. 1919, 1930–1938 (2006).

has thus given no reason to be skeptical of the basic
design, function, or rationale of the Nondiscrimination
Policy.

What the policy does reflect is a judgment that dis-
crimination by school officials or organizations on the
basis of certain factors, such as race and religion, is less
tolerable than discrimination on the basis of other factors.
This approach may or may not be the wisest choice in the
context of a Registered Student Organization (RSO) pro-
gram. But it is at least a reasonable choice. Academic
administrators routinely employ antidiscrimination rules
to promote tolerance, understanding, and respect, and to
safeguard students from invidious forms of discrimination,
including sexual orientation discrimination.[3] Applied to
the RSO context, these values can, in turn, advance nu-
merous pedagogical objectives. See *post*, at 3–4
(KENNEDY, J., concurring).

It is critical, in evaluating CLS's challenge to the Non-
discrimination Policy, to keep in mind that an RSO pro-
gram is a *limited* forum—the boundaries of which may be
*delimited* by the proprietor. When a religious association,
or a secular association, operates in a wholly public set-
ting, it must be allowed broad freedom to control its mem-
bership and its message, even if its decisions cause offense
to outsiders. Profound constitutional problems would
arise if the State of California tried to "demand that all
Christian groups admit members who believe that Jesus

---

[3] In a case about an antidiscrimination policy that, even if ill-advised,
is explicitly directed at *preventing* religious discrimination, it is rather
hard to swallow the dissent's ominous closing remarks. See *post*, at 37
(suggesting that today's decision "point[s] a judicial dagger at the heart
of" religious groups in the United States (internal quotation marks
omitted)). Although the dissent is willing to see pernicious antireligi-
ous motives and implications where there are none, it does not seem
troubled by the fact that religious sects, unfortunately, are not the only
social groups who have been persecuted throughout history simply for
being who they are.

was merely human." *Post*, at 27 (ALITO, J., dissenting). But the CLS chapter that brought this lawsuit does not want to be just a Christian group; it aspires to be a recognized student organization. The Hastings College of Law is not a legislature. And no state actor has demanded that anyone do anything outside the confines of a discrete, voluntary academic program. Although it may be the case that to some "university students, the campus is their world," *post*, at 13 (internal quotation marks omitted), it does not follow that the campus ought to be equated with the public square.

The campus is, in fact, a world apart from the public square in numerous respects, and religious organizations, as well as all other organizations, must abide by certain norms of conduct when they enter an academic community. Public universities serve a distinctive role in a modern democratic society. Like all specialized government entities, they must make countless decisions about how to allocate resources in pursuit of their role. Some of those decisions will be controversial; many will have differential effects across populations; virtually all will entail value judgments of some kind. As a general matter, courts should respect universities' judgments and let them manage their own affairs.

The RSO forum is no different. It is not an open commons that Hastings happens to maintain. It is a mechanism through which Hastings confers certain benefits and pursues certain aspects of its educational mission. Having exercised its discretion to establish an RSO program, a university must treat all participants evenhandedly. But the university need not remain neutral—indeed it could not remain neutral—in determining which goals the program will serve and which rules are best suited to facilitate those goals. These are not legal questions but policy questions; they are not for the Court but for the university to make. When any given group refuses to comply with

the rules, the RSO sponsor need not admit that group at the cost of undermining the program and the values reflected therein. On many levels, a university administrator has a "greater interest in the content of student activities than the police chief has in the content of a soapbox oration." *Widmar* v. *Vincent*, 454 U. S. 263, 280 (1981) (STEVENS, J., concurring in judgment).

In this case, petitioner excludes students who will not sign its Statement of Faith or who engage in "unrepentant homosexual conduct," App. 226. The expressive association argument it presses, however, is hardly limited to these facts. Other groups may exclude or mistreat Jews, blacks, and women—or those who do not share their contempt for Jews, blacks, and women. A free society must tolerate such groups. It need not subsidize them, give them its official imprimatur, or grant them equal access to law school facilities.

1

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1371

_____

CHRISTIAN LEGAL SOCIETY CHAPTER OF THE UNI-
VERSITY OF CALIFORNIA, HASTINGS COLLEGE OF
THE LAW, AKA HASTINGS CHRISTIAN FELLOW-
SHIP, PETITIONER *v.* LEO P. MARTINEZ ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2010]

JUSTICE KENNEDY, concurring.

To be effective, a limited forum often will exclude some speakers based on their affiliation (*e.g.*, student versus nonstudent) or based on the content of their speech, inter- ests, and expertise (*e.g.*, art professor not chosen as speaker for conference on public transit). When the gov- ernment does exclude from a limited forum, however, other content-based judgments may be impermissible. For instance, an otherwise qualified and relevant speaker may not be excluded because of hostility to his or her views or beliefs. See *Healy* v. *James*, 408 U. S. 169, 187–188 (1972).

In *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995), the essential purpose of the limited forum was to facilitate the expression of differing views in the context of student publications. The forum was lim- ited because it was confined: first, to student-run groups; and second, to publications. The forum was created in the long tradition of using newspapers and other publications to express differing views and also in the honored tradi- tion of a university setting that stimulates the free ex- change of ideas. See *id.,* at 835 ("[I]n the University set- ting, . . . the State acts against a background and tradition

of thought and experiment that is at the center of our intellectual and philosophic tradition"). These considerations supported the Court's conclusion that, under the First Amendment, a limited forum for student-run publications did not permit the exclusion of a paper for the reason that it was devoted to expressing religious views.

*Rosenberger* is distinguishable from the instant case in various respects. Not least is that here the school policy in question is not content based either in its formulation or evident purpose; and were it shown to be otherwise, the case likely should have a different outcome. Here, the policy applies equally to all groups and views. And, given the stipulation of the parties, there is no basis for an allegation that the design or purpose of the rule was, by subterfuge, to discriminate based on viewpoint.

An objection might be that the all-comers policy, even if not so designed or intended, in fact makes it difficult for certain groups to express their views in a manner essential to their message. A group that can limit membership to those who agree in full with its aims and purposes may be more effective in delivering its message or furthering its expressive objectives; and the Court has recognized that this interest can be protected against governmental interference or regulation. See *Boy Scouts of America* v. *Dale*, 530 U. S. 640 (2000). By allowing like-minded students to form groups around shared identities, a school creates room for self-expression and personal development. See *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 229 (2000) ("The University's whole justification for [its student activity program] is that it springs from the initiative of the students, who alone give it purpose and content in the course of their extracurricular endeavors").

In the instant case, however, if the membership qualification were enforced, it would contradict a legitimate purpose for having created the limited forum in the first

place. Many educational institutions, including respondent Hastings College of Law, have recognized that the process of learning occurs both formally in a classroom setting and informally outside of it. See *id.,* at 233. Students may be shaped as profoundly by their peers as by their teachers. Extracurricular activities, such as those in the Hastings "Registered Student Organization" program, facilitate interactions between students, enabling them to explore new points of view, to develop interests and talents, and to nurture a growing sense of self. See *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty.* v. *Earls*, 536 U. S. 822, 831, n. 4 (2002) (participation in extracurricular activities is "'a significant contributor to the breadth and quality of the educational experience'"). The Hasting program is designed to allow all students to interact with their colleagues across a broad, seemingly unlimited range of ideas, views, and activities. See *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 312, 313, n. 48 (1978) (opinion of Powell, J.) ("[A] great deal of learning . . . occurs through interactions among students . . . who have a wide variety of interests, talents, and perspectives; and who are able, directly or indirectly, to learn from their differences and to stimulate one another to reexamine even their most deeply held assumptions about themselves and their world" (alteration in original; internal quotation marks omitted)).

Law students come from many backgrounds and have but three years to meet each other and develop their skills. They do so by participating in a community that teaches them how to create arguments in a convincing, rational, and respectful manner and to express doubt and disagreement in a professional way. A law school furthers these objectives by allowing broad diversity in registered student organizations. But these objectives may be better achieved if students can act cooperatively to learn from and teach each other through interactions in social and

intellectual contexts. A vibrant dialogue is not possible if students wall themselves off from opposing points of view.

The school's objectives thus might not be well served if, as a condition to membership or participation in a group, students were required to avow particular personal beliefs or to disclose private, off-campus behavior. Students whose views are in the minority at the school would likely fare worse in that regime. Indeed, were those sorts of requirements to become prevalent, it might undermine the principle that in a university community—and in a law school community specifically—speech is deemed persuasive based on its substance, not the identity of the speaker. The era of loyalty oaths is behind us. A school quite properly may conclude that allowing an oath or belief-affirming requirement, or an outside conduct requirement, could be divisive for student relations and inconsistent with the basic concept that a view's validity should be tested through free and open discussion. The school's policy therefore represents a permissible effort to preserve the value of its forum.

In addition to a circumstance, already noted, in which it could be demonstrated that a school has adopted or enforced its policy with the intent or purpose of discriminating or disadvantaging a group on account of its views, petitioner also would have a substantial case on the merits if it were shown that the all-comers policy was either designed or used to infiltrate the group or challenge its leadership in order to stifle its views. But that has not been shown to be so likely or self-evident as a matter of group dynamics in this setting that the Court can declare the school policy void without more facts; and if there were a showing that in a particular case the purpose or effect of the policy was to stifle speech or make it ineffective, that, too, would present a case different from the one before us.

These observations are offered to support the analysis set forth in the opinion of the Court, which I join.

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1371

———————

## CHRISTIAN LEGAL SOCIETY CHAPTER OF THE UNI-VERSITY OF CALIFORNIA, HASTINGS COLLEGE OF THE LAW, AKA HASTINGS CHRISTIAN FELLOW-SHIP, PETITIONER *v.* LEO P. MARTINEZ ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 28, 2010]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

The proudest boast of our free speech jurisprudence is that we protect the freedom to express "the thought that we hate." *United States* v. *Schwimmer*, 279 U. S. 644, 654–655 (1929) (Holmes, J., dissenting). Today's decision rests on a very different principle: no freedom for expression that offends prevailing standards of political correctness in our country's institutions of higher learning.

The Hastings College of the Law, a state institution, permits student organizations to register with the law school and severely burdens speech by unregistered groups. Hastings currently has more than 60 registered groups and, in all its history, has denied registration to exactly one: the Christian Legal Society (CLS). CLS claims that Hastings refused to register the group because the law school administration disapproves of the group's viewpoint and thus violated the group's free speech rights.

Rejecting this argument, the Court finds that it has been Hastings' policy for 20 years that all registered organizations must admit *any* student who wishes to join. Deferring broadly to the law school's judgment about the permissible limits of student debate, the Court concludes

that this "accept-all-comers" policy, *ante*, at 1, is both
viewpoint-neutral and consistent with Hastings' pro-
claimed policy of fostering a diversity of viewpoints among
registered student groups.

The Court's treatment of this case is deeply disappoint-
ing.  The Court does not address the constitutionality of
the very different policy that Hastings invoked when it
denied CLS's application for registration.  Nor does the
Court address the constitutionality of the policy that
Hastings now purports to follow.  And the Court ignores
strong evidence that the accept-all-comers policy is not
viewpoint neutral because it was announced as a pretext
to justify viewpoint discrimination.  Brushing aside incon-
venient precedent, the Court arms public educational
institutions with a handy weapon for suppressing the
speech of unpopular groups—groups to which, as Hastings
candidly puts it, these institutions "do not wish to . . . lend
their name[s]."  Brief for Respondent Hastings College of
Law 11; see also *id.*, at 35.

## I

The Court provides a misleading portrayal of this case.
As related by the Court, (1) Hastings, for the past 20
years, has required any student group seeking registration
to admit any student who wishes to join, *ante*, at 5; (2) the
effects of Hastings' refusal to register CLS have been of
questionable importance, see *ante*, at 24–25; and (3) this
case is about CLS's desire to obtain "a state subsidy," *ante*,
at 15.  I begin by correcting the picture.

## A

The Court bases all of its analysis on the proposition
that the relevant Hastings' policy is the so-called accept-
all-comers policy.  This frees the Court from the difficult
task of defending the constitutionality of either the policy
that Hastings actually—and repeatedly—invoked when it

denied registration, *i.e.*, the school's written Nondiscrimi-
nation Policy, or the policy that Hastings belatedly un-
veiled when it filed its brief in this Court. Overwhelming
evidence, however, shows that Hastings denied CLS's
application pursuant to the Nondiscrimination Policy and
that the accept-all-comers policy was nowhere to be found
until it was mentioned by a former dean in a deposition
taken well after this case began.

The events that gave rise to this litigation began in
2004, when a small group of Hastings students sought to
register a Hastings chapter of CLS, a national organiza-
tion of Christian lawyers and law students. All CLS
members must sign a Statement of Faith affirming belief
in fundamental Christian doctrines, including the belief
that the Bible is "the inspired Word of God." App. 226. In
early 2004, the national organization adopted a resolution
stating that "[i]n view of the clear dictates of Scripture,
unrepentant participation in or advocacy of a sexually
immoral lifestyle is inconsistent with an affirmation of the
Statement of Faith, and consequently may be regarded by
CLS as disqualifying such an individual from CLS mem-
bership." *Id.*, at 146. The resolution made it clear that "a
sexually immoral lifestyle," in CLS's view, includes engag-
ing in "acts of sexual conduct outside of God's design for
marriage between one man and one woman." *Ibid.* It was
shortly after this resolution was passed that the Hastings
chapter of CLS applied to register with the law school.

Hastings sponsors an active program of "registered
student organizations" (RSOs) pursuant to the law school's
avowed responsibility to "ensure an opportunity for the
expression of a variety of viewpoints" and promote "the
highest standards of . . . freedom of expression," App. to
Pet. for Cert. 82a, 74a. During the 2004–2005 school year,
Hastings had more than 60 registered groups, including
political groups (*e.g.*, the Hastings Democratic Caucus and
the Hastings Republicans), religious groups (*e.g.*, the

Hastings Jewish Law Students Association and the Hastings Association of Muslim Law Students), groups that promote social causes (*e.g.*, both pro-choice and pro-life groups), groups organized around racial or ethnic identity (*e.g.*, the Black Law Students Association, the Korean American Law Society, La Raza Law Students Association, and the Middle Eastern Law Students Association), and groups that focus on gender or sexuality (*e.g.*, the Clara Foltz Feminist Association and Students Raising Consciousness at Hastings). See App. 236–245; Brief for Petitioner 3–4.

Not surprisingly many of these registered groups were and are dedicated to expressing a message. For example, Silenced Right, a pro-life group, taught that "all human life from the moment of conception until natural death is sacred and has inherent dignity," *id.*, at 244, while Law Students for Choice aimed to "defend and expand reproductive rights," *id.*, at 243. The American Constitution Society sought "to counter . . . a narrow conservative vision" of American law," *id.*, at 236, and the UC Hastings Student Animal Defense Fund aimed "at protecting the lives and advancing the interests of animals through the legal system," *id.*, at 245.

Groups that are granted registration are entitled to meet on university grounds and to access multiple channels for communicating with students and faculty—including posting messages on designated bulletin boards, sending mass e-mails to the student body, distributing material through the Student Information Center, and participating in the annual student organizations fair. App. to Pet. for Cert. 7a, 85a. They may also apply for limited travel funds, *id.*, at 7a, which appear to total about $4,000 to $5,000 per year, App. 217—or less than $85 per registered group. Most of the funds available to RSOs come from an annual student activity fee that every student must pay. See App. to Pet. for Cert. 89a–93a.

When CLS applied for registration, Judy Hansen Chapman, the Director of Hastings' Office of Student Services, sent an e-mail to an officer of the chapter informing him that "CLS's bylaws did not appear to be compliant" with the Hastings Nondiscrimination Policy, App. 228, 277, a written policy that provides in pertinent part that "[t]he University of California, Hastings College of the Law shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation," *id.*, at 220. As far as the record reflects, Ms. Chapman made no mention of an accept-all-applicants policy.

A few days later, three officers of the chapter met with Ms. Chapman, and she reiterated that the CLS bylaws did not comply with "the religion and sexual orientation provisions of the Nondiscrimination Policy and that they would need to be amended in order for CLS to become a registered student organization." *Id.*, at 228. About a week later, Hastings sent CLS a letter to the same effect. *Id.*, at 228–229, 293–295. On both of these occasions, it appears that not a word was said about an accept-all-comers policy.

When CLS refused to change its membership requirements, Hastings denied its request for registration—thus making CLS the only student group whose application for registration has ever been rejected. Brief in Opposition 4.

In October 2004, CLS brought this action under 42 U. S. C. §1983 against the law school's dean and other school officials, claiming, among other things, that the law school, by enacting and enforcing the Nondiscrimination Policy, had violated CLS's First Amendment right to freedom of speech. App. 78.

In May 2005, Hastings filed an answer to CLS's first amended complaint and made an admission that is significant for present purposes. In its complaint, CLS had alleged that the Nondiscrimination Policy discriminates

against religious groups because it prohibits those groups "from selecting officers and members dedicated to a particular set of religious ideals or beliefs" but "permits political, social and cultural student organizations to select officers and members dedicated to their organization's ideals and beliefs." *Id.*, at 79. In response, Hastings admitted that its Nondiscrimination Policy "permits political, social, and cultural student organizations to select officers and members who are dedicated to a particular set of ideals or beliefs." *Id.*, at 93. The Court states that "Hastings interprets the Nondiscrimination Policy, as it relates to the RSO program, to mandate acceptance of all comers." *Ante*, at 4. But this admission in Hastings' answer shows that Hastings had not adopted this interpretation when its answer was filed.

Within a few months, however, Hastings' position changed. In July 2005, Mary Kay Kane, then the dean of the law school, was deposed, and she stated: "It is my view that in order to be a registered student organization you have to allow all of our students to be members and full participants if they want to." App. 343. In a declaration filed in October 2005, Ms. Chapman provided a more developed explanation, stating: "Hastings interprets the Nondiscrimination Policy as requiring that student organizations wishing to register with Hastings allow any Hastings student to become a member and/or seek a leadership position in the organization." *Id.*, at 349.

Hastings claims that this accept-all-comers policy has existed since 1990 but points to no evidence that the policy was ever put in writing or brought to the attention of members of the law school community prior to the dean's deposition. Indeed, Hastings has adduced no evidence of the policy's existence before that date. And while Dean Kane and Ms. Chapman stated, well after this litigation had begun, that Hastings had such a policy, neither they nor any other Hastings official has ever stated in a deposi-

tion, affidavit, or declaration when this policy took effect.

Hastings' effort to portray the accept-all-comers policy as merely an interpretation of the Nondiscrimination Policy runs into obvious difficulties. First, the two policies are simply not the same: The Nondiscrimination Policy proscribes discrimination on a limited number of specified grounds, while the accept-all-comers policy outlaws all selectivity. Second, the Nondiscrimination Policy applies to everything that Hastings does, and the law school does not follow an accept-all-comers policy in activities such as admitting students and hiring faculty.

In an effort to circumvent this problem, the Court writes that "Hastings interprets the Nondiscrimination Policy, *as it relates to the RSO program*, to mandate acceptance of all comers." *Ante*, at 4 (emphasis added). This puts Hastings in the implausible position of maintaining that the Nondiscrimination Policy means one thing as applied to the RSO program and something quite different as applied to all of Hastings' other activities. But the Nondiscrimination Policy by its terms applies fully to all components of the law school, "including administration [and] faculty." App. 220.

Third, the record is replete with evidence that, at least until Dean Kane unveiled the accept-all-comers policy in July 2005, Hastings routinely registered student groups with bylaws limiting membership and leadership positions to those who agreed with the groups' viewpoints. For example, the bylaws of the Hastings Democratic Caucus provided that "any full-time student at Hastings may become a member of HDC *so long as they do not exhibit a consistent disregard and lack of respect for the objective of the organization* as stated in Article 3, Section 1." App. to Pet. for Cert. 118a (emphasis added). The constitution of the Association of Trial Lawyers of America at Hastings provided that every member must "adhere to the objectives of the Student Chapter as well as the mission of

ATLA." *Id.*, at 110a. A student could become a member of the Vietnamese American Law Society so long as the student did not "exhibit a consistent disregard and lack of respect for the objective of the organization," which centers on a "celebrat[ion] [of] Vietnamese culture." *Id.*, at 146a–147a. Silenced Right limited voting membership to students who "are committed" to the group's "mission" of "spread[ing] the pro-life message." *Id.*, at 142a–143a. La Raza limited voting membership to "students of Raza background." App. 192. Since Hastings requires any student group applying for registration to submit a copy of its bylaws, see *id.*, at 249–250, Hastings cannot claim that it was unaware of such provisions. And as noted, CLS was denied registration precisely because Ms. Chapman reviewed its bylaws and found them unacceptable.

We are told that, when CLS pointed out these discrepancies during this litigation, Hastings took action to ensure that student groups were in fact complying with the law school's newly disclosed accept-all-comers policy. For example, Hastings asked La Raza to revise its bylaws to allow all students to become voting members. App. to Pet. for Cert. 66a. See also Brief for State of Michigan et al. as *Amici Curiae* 2, n. 1 (relating anecdotally that Hastings recently notified the Hastings Democrats that "to maintain the Club's standing as a student organization," it must "open its membership to all students, regardless of party affiliation"). These belated remedial efforts suggest, if anything, that Hastings had no accept-all-comers policy until this litigation was well under way.

Finally, when Hastings filed its brief in this Court, its policy, which had already evolved from a policy prohibiting certain specified forms of discrimination into an accept-all-comers policy, underwent yet another transformation. Now, Hastings claims that it does not really have an accept-all-comers policy; it has an accept-*some*-comers policy. Hastings' current policy, we are told, "does not

foreclose neutral and generally applicable membership requirements unrelated to 'status or beliefs.'" Brief for Respondent Hastings College of Law 5. Hastings' brief goes on to note with seeming approval that some registered groups have imposed "even conduct requirements." *Ibid.* Hastings, however, has not told us which "conduct requirements" are allowed and which are not—although presumably requirements regarding sexual conduct fall into the latter category.

When this case was in the District Court, that court took care to address both the Nondiscrimination Policy and the accept-all-comers policy. See, *e.g.*, App. to Pet. for Cert. 8a–9a, 16a–17a, 21a–24a, 26a, 27a, 32a, 44a, 63a. On appeal, however, a panel of the Ninth Circuit, like the Court today, totally ignored the Nondiscrimination Policy. CLS's argument in the Ninth Circuit centered on the Nondiscrimination Policy, and CLS argued strenuously, as it had in the District Court, that prior to the former dean's deposition, numerous groups had been permitted to restrict membership to students who shared the groups' views.[1] Nevertheless, the Ninth Circuit disposed of CLS's

_____

[1] CLS consistently argued in the courts below that Hastings had applied its registration policy in a discriminatory manner. See, *e.g.*, Plaintiff's Notice of Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment in No. C 04–4484–JSW (ND Cal.), pp. 6–7 ("Hastings allows other registered student organizations to require that their members and/or leaders agree with the organization's beliefs and purposes"). CLS took pains to bring forward evidence to substantiate this claim. See *supra*, at 7–8.

CLS's brief in the Court of Appeals reiterated its contention that Hastings had not required all RSOs to admit all student applicants. CLS's brief stated that "Hastings allows other registered student organizations to require that their leaders and/or members agree with the organization's beliefs and purposes." Brief for Appellant in No. 06–15956 (CA9), pp. 14–15 (citing examples). See also *id.*, at 54–55 ("Hastings routinely recognizes student groups that limit membership or leadership on the basis of belief. . . . Hastings' actual practice demonstrates that the forum is not reserved to student organizations that do

appeal with a two-sentence, not-precedential opinion that solely addressed the accept-all-comers policy. *Christian Legal Soc. Chapter of Univ. of Cal.* v. *Kane*, 319 Fed. Appx. 645–646 (2009).

Like the majority of this Court, the Ninth Circuit relied on the following Joint Stipulation, which the parties filed in December 2005, well after Dean Kane's deposition:

> "Hastings requires that registered student organizations allow any student to participate, become a member, or seek leadership positions in the organization, regardless of their status or beliefs." App. 221.

Citing the binding effect of stipulations, the majority sternly rejects what it terms "CLS's unseemly attempt to escape from the stipulation and shift its target to [the Nondiscrimination Policy]." *Ante,* at 11–12.

I agree that the parties must be held to their Joint Stipulation, but the terms of the stipulation should be respected. What was admitted in the Joint Stipulation filed in December 2005 is that Hastings had an accept-all-comers policy. CLS did not stipulate that its application had been denied more than a year earlier pursuant to such a policy. On the contrary, the Joint Stipulation notes that the reason repeatedly given by Hasting at that time was that the CLS bylaws did not comply with *the Nondiscrimination Policy.* See App. 228–229. Indeed, the parties did not even stipulate that the accept-all-comers policy existed in the fall of 2004. In addition, Hastings itself is now attempting to walk away from this stipulation by disclosing that its real policy is an accept-some-comers policy.

————————

not discriminate on the basis of belief"). Responding to these arguments, the law school remarked that CLS "repeatedly asserts that 'Hastings routinely recognizes student groups that limit membership or leadership on the basis of belief.'" Brief for Appellees in No. 06–15956 (CA9), p. 4.

The majority's insistence on the binding effect of stipulations contrasts sharply with its failure to recognize the binding effect of a party's admissions in an answer. See *American Title Insurance Co.* v. *Lacelaw Corp.*, 861 F. 2d 224, 226 (CA9 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them"); *Bakersfield Westar Ambulance, Inc.* v. *Community First Bank*, 123 F. 3d 1243, 1248 (CA9 1997) (quoting *Lacelaw*, *supra*). As noted above, Hastings admitted in its answer, which was filed prior to the former dean's deposition, that at least as of that time, the law school did not follow an accept-all-comers policy and instead allowed "political, social, and cultural student organizations to select officers and members who are dedicated to a particular set of ideals or beliefs." App. 93.

### B

The Court also distorts the record with respect to the effect on CLS of Hastings' decision to deny registration. The Court quotes a letter written by Hastings' general counsel in which she stated that Hastings "'would be pleased to provide [CLS] the use of Hastings facilities for its meetings and activities.'" *Ante*, at 6 (quoting App. 294). Later in its opinion, the Court reiterates that "Hastings offered CLS access to school facilities to conduct meetings," *ante*, at 24, but the majority does not mention that this offer was subject to important qualifications. As Hastings' attorney put it in the District Court, Hastings told CLS: "'Hastings allows community groups to some degree to use its facilities, sometimes on a pay basis, I understand, if they're available after priority is given to registered organizations'. We offered that." App. 442.

The Court also fails to mention what happened when CLS attempted to take advantage of Hastings' offer. On August 19, 2005, the local CLS president sent an e-mail to

Ms. Chapman requesting permission to set up an "advice table" on a campus patio on August 23 and 24 so that members of CLS could speak with students at the beginning of the fall semester. *Id.*, at 298. This request—merely to set up a table on a patio—could hardly have interfered with any other use of the law school's premises or cost the school any money. But although the request was labeled "time sensitive," *ibid.*, Ms. Chapman did not respond until the dates in question had passed, and she then advised the student that all further inquiries should be made through CLS's attorney. *Id.*, at 297–298.

In September 2005, CLS tried again. Through counsel, CLS sought to reserve a room on campus for a guest speaker who was scheduled to appear on a specified date. *Id.*, at 302–303. Noting Ms. Chapman's tardy response on the prior occasion, the attorney asked to receive a response before the scheduled date, but once again no answer was given until after the date had passed. *Id.*, at 300.

Other statements in the majority opinion make it seem as if the denial of registration did not hurt CLS at all. The Court notes that CLS was able to hold Bible-study meetings and other events. *Ante*, at 6. And "[a]lthough CLS could not take advantage of RSO-specific methods of communication," the Court states, "the advent of electronic media and social-networking sites reduces the importance of those channels." *Ante*, at 24.

At the beginning of the 2005 school year, the Hastings CLS group had seven members, App. to Pet. for Cert. 13a, so there can be no suggestion that the group flourished. And since one of CLS's principal claims is that it was subjected to discrimination based on its viewpoint, the majority's emphasis on CLS's ability to endure that discrimination—by using private facilities and means of communication—is quite amazing.

This Court does not customarily brush aside a claim of

unlawful discrimination with the observation that the effects of the discrimination were really not so bad. We have never before taken the view that a little viewpoint discrimination is acceptable. Nor have we taken this approach in other discrimination cases.

## C

Finally, I must comment on the majority's emphasis on funding. According to the majority, CLS is "seeking what is effectively a state subsidy," *ante*, at 15, and the question presented in this case centers on the "use of school funds," *ante*, at 1. In fact, funding plays a very small role in this case. Most of what CLS sought and was denied—such as permission to set up a table on the law school patio— would have been virtually cost free. If every such activity is regarded as a matter of funding, the First Amendment rights of students at public universities will be at the mercy of the administration. As CLS notes, "[t]o university students, the campus is their world. The right to meet on campus and use campus channels of communication is at least as important to university students as the right to gather on the town square and use local communication forums is to the citizen." Reply Brief for Petitioner 13.

## II

To appreciate how far the Court has strayed, it is instructive to compare this case with *Healy* v. *James*, 408 U. S. 169 (1972), our only First Amendment precedent involving a public college's refusal to recognize a student group. The group in *Healy* was a local chapter of the Students for a Democratic Society (SDS). When the students who applied for recognition of the chapter were asked by a college committee whether they would "'respond to issues of violence as other S.D.S. chapters have,'" their answer was that their "'action would have to be

dependent upon each issue.'" *Id.*, at 172–173. They similarly refused to provide a definitive answer when asked whether they would be willing to "use any means possible" to achieve their aims. *Id.*, at 173. The president of the college refused to allow the group to be recognized, concluding that the philosophy of the SDS was "antithetical to the school's policies" and that it was doubtful that the local chapter was independent of the national organization, the "'published aims and philosophy'" of which included "'disruption and violence.'" *Id.*, at 174–175, and n. 4.

The effects of nonrecognition in *Healy* were largely the same as those present here. The SDS was denied the use of campus facilities, as well as access to the customary means used for communication among the members of the college community. *Id.*, at 176, 181–182.

The lower federal courts held that the First Amendment rights of the SDS chapter had not been violated, and when the case reached this Court, the college, much like today's majority, sought to minimize the effects of nonrecognition, arguing that the SDS members "still may meet as a group off campus, that they still may distribute written material off campus, and that they still may meet together informally on campus . . . as individuals." *Id.*, at 182–183.

This Court took a different view. The Court held that the denial of recognition substantially burdened the students' right to freedom of association. After observing that "[t]he primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes," *id.*, at 181, the Court continued:

> "Petitioners' associational interests also were circumscribed by the denial of the use of campus bulletin boards and the school newspaper. If an organization is to remain a viable entity in a campus community in

which new students enter on a regular basis, it must possess the means of communicating with these students. Moreover, the organization's ability to participate in the intellectual give and take of campus debate, and to pursue its stated purposes, is limited by denial of access to the customary media for communicating with the administration, faculty members, and other students. Such impediments cannot be viewed as insubstantial." *Id.*, at 181–182.

It is striking that all of these same burdens are now borne by CLS. CLS is prevented from using campus facilities—unless at some future time Hastings chooses to provide a timely response to a CLS request and allow the group, as a favor or perhaps in exchange for a fee, to set up a table on the patio or to use a room that would otherwise be unoccupied. And CLS, like the SDS in *Healy*, has been cut off from "the customary media for communicating with the administration, faculty members, and other students." *Id.*, at 181–182.

It is also telling that the *Healy* Court, unlike today's majority, refused to defer to the college president's judgment regarding the compatibility of "sound educational policy" and free speech rights. The same deference arguments that the majority now accepts were made in defense of the college president's decision to deny recognition in *Healy*. Respondents in that case emphasized that the college president, not the courts, had the responsibility of administering the institution and that the courts should allow him "'wide discretion . . . in determining what actions are most compatible with its educational objectives.'" Brief for Respondents in *Healy* v. *James*, O. T. 1971, No. 71–452, pp. 7–8. A supporting *amicus* contended that college officials "must be allowed a very broad discretion in formulating and implementing policies." Brief for Board of Trustees, California State Colleges 6. Another argued

that universities should be permitted to impose restrictions on speech that would not be tolerated elsewhere. Brief for American Association of Presidents of Independent Colleges and Universities 11–12.

The *Healy* Court would have none of this. Unlike the Court today, the *Healy* Court emphatically rejected the proposition that "First Amendment protections should apply with less force on college campuses than in the community at large." 408 U. S., at 180. And on one key question after another—whether the local SDS chapter was independent of the national organization, whether the group posed a substantial threat of material disruption, and whether the students' responses to the committee's questions about violence and disruption signified a willingness to engage in such activities—the Court drew its own conclusions, which differed from the college president's.

The *Healy* Court was true to the principle that when it comes to the interpretation and application of the right to free speech, we exercise our own independent judgment. We do not defer to Congress on such matters, see *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 129 (1989), and there is no reason why we should bow to university administrators.

In the end, I see only two possible distinctions between *Healy* and the present case. The first is that *Healy* did not involve any funding, but as I have noted, funding plays only a small part in this case. And if *Healy* would otherwise prevent Hastings from refusing to register CLS, I see no good reason why the potential availability of funding should enable Hastings to deny all of the other rights that go with registration.

This leaves just one way of distinguishing *Healy*: the identity of the student group. In *Healy*, the Court warned that the college president's views regarding the philosophy of the SDS could not "justify the denial of First Amend-

ment rights." 408 U. S., at 187. Here, too, disapproval of CLS cannot justify Hastings' actions.[2]

### III

The Court pays little attention to *Healy* and instead focuses solely on the question whether Hastings' registration policy represents a permissible regulation in a limited public forum. While I think that *Healy* is largely controlling, I am content to address the constitutionality of Hastings' actions under our limited public forum cases, which lead to exactly the same conclusion.

In this case, the forum consists of the RSO program. Once a public university opens a limited public forum, it "must respect the lawful boundaries it has itself set." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). The university "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum.'" *Ibid.* (quoting *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 806 (1985)). And the university must maintain strict viewpoint neutrality. *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 234 (2000); *Rosenberger*, *supra*, at 829.

This requirement of viewpoint neutrality extends to the expression of religious viewpoints. In an unbroken line of decisions analyzing private religious speech in limited public forums, we have made it perfectly clear that "[r]eligion is [a] viewpoint from which ideas are conveyed."

---

[2] The Court attempts to distinguish *Healy* on the ground that there the college "explicitly denied the student group official recognition *because of* the group's viewpoint." *Ante*, at 17, n. 15. The same, however, is true here. CLS was denied recognition under the Nondiscrimination Policy because of the viewpoint that CLS sought to express through its membership requirements. See *supra*, at 5; *infra*, at 18–23. And there is strong evidence that Hastings abruptly shifted from the Nondiscrimination Policy to the accept-all-comers policy as a pretext for viewpoint discrimination. See *infra*, at 31–35.

*Good News Club* v. *Milford Central School*, 533 U. S. 98, 112, and n. 4 (2001). See *Rosenberger*, *supra*, at 831; *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 393–394 (1993); *Widmar* v. *Vincent*, 454 U. S. 263, 277 (1981).

We have applied this analysis in cases in which student speech was restricted because of the speaker's religious viewpoint, and we have consistently concluded that such restrictions constitute viewpoint discrimination. *E.g.*, *Rosenberger*, *supra*, at 845–846; *Widmar*, *supra*, at 267, n. 5, 269, 277; see also *Good News Club*, *supra*, at 106–107, 109–110; *Lamb's Chapel*, *supra*, at 392–393, 394. We have also stressed that the rules applicable in a limited public forum are particularly important in the university setting, where "the State acts against a background of tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, *supra*, at 835.

## IV

Analyzed under this framework, Hastings' refusal to register CLS pursuant to its Nondiscrimination Policy plainly fails.[3] As previously noted, when Hastings refused

---

[3] CLS sought a declaratory judgment that this policy is unconstitutional and an injunction prohibiting its enforcement. See App. 80. Particularly in light of Hastings' practice of changing its announced policies, these requests are not moot. It is well settled that the voluntary cessation of allegedly unlawful conduct does not moot a case in which the legality of that conduct is challenged. See *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 289 (1982); see also *Allee* v. *Medrano*, 416 U. S. 802, 810–811 (1974); *DeFunis* v. *Odegaard*, 416 U. S. 312, 318 (1974) *(per curiam).* If the rule were otherwise, the courts would be compelled to leave "'[t]he defendant . . . free to return to his old ways.'" *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U. S. 199, 203 (1968) (quoting *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632 (1953)). Here, there is certainly a risk that Hastings will "return to [its] old ways," and therefore CLS's requests for declaratory and injunctive relief with respect to the Non-

to register CLS, it claimed that the CLS bylaws impermissibly discriminated on the basis of religion and sexual orientation. As interpreted by Hastings and applied to CLS, both of these grounds constituted viewpoint discrimination.

*Religion*. The First Amendment protects the right of "'expressive association'"—that is, "the right to associate for the purpose of speaking." *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 68 (2006) (quoting *Boy Scouts of America* v. *Dale*, 530 U. S. 640, 644 (2000)). And the Court has recognized that "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, *supra*, at 648.

With one important exception, the Hastings Nondiscrimination Policy respected that right. As Hastings stated in its answer, the Nondiscrimination Policy "permit[ted] political, social, and cultural student organizations to select officers and members who are dedicated to a particular set of ideals or beliefs." App. 93. But the policy singled out one category of expressive associations for disfavored treatment: groups formed to express a religious message. Only religious groups were required to admit students who did not share their views. An environmentalist group was not required to admit students who re-

———————

discrimination Policy are not moot. If, as the Court assumes, the parties stipulated that the only relevant policy is the accept-all-comers policy, then the District Court should not have addressed the constitutionality of the Nondiscrimination Policy. But the District Court approved both policies, and the Court of Appeals affirmed the judgment. That judgment remains binding on CLS, so it is only appropriate that CLS be permitted to challenge that determination now. The question of the constitutionality of the Nondiscrimination Policy falls comfortably within the question presented, and CLS raised that issue in its brief. See Brief for Petitioner 41–46.

jected global warming. An animal rights group was not obligated to accept students who supported the use of animals to test cosmetics. But CLS was required to admit avowed atheists. This was patent viewpoint discrimination. "By the very terms of the [Nondiscrimination Policy], the University . . . select[ed] for disfavored treatment those student [groups] with religious . . . viewpoints." *Rosenberger*, 515 U. S., at 831. It is no wonder that the Court makes no attempt to defend the constitutionality of the Nondiscrimination Policy.

Unlike the Court, JUSTICE STEVENS attempts a defense, contending that the Nondiscrimination Policy is viewpoint neutral. But his arguments are squarely contrary to established precedent.

JUSTICE STEVENS first argues that the Nondiscrimination Policy is viewpoint neutral because it "does not regulate expression or belief at all" but instead regulates conduct. See *ante*, at 2 (concurring opinion). This Court has held, however, that the particular conduct at issue here constitutes a form of expression that is protected by the First Amendment. It is now well established that the First Amendment shields the right of a group to engage in expressive association by limiting membership to persons whose admission does not significantly interfere with the group's ability to convey its views. See *Dale*, *supra*, at 648; *Roberts* v. *United States Jaycees*, 468 U. S. 609, 623 (1984); see also *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 13 (1988) (acknowledging that an "association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion"); *Widmar*, *supra*, at 268–269 ("[T]he First Amendment rights of speech and association extend to the campuses of state universities"). Indeed, the opinion of the Court, which

JUSTICE STEVENS joins, acknowledges this rule. See *ante*, at 13.

JUSTICE STEVENS also maintains that the Nondiscrimination Policy is viewpoint neutral because it prohibits all groups, both religious and secular, from engaging in religious speech. See *ante*, at 3. This argument is also contrary to established law. In *Rosenberger*, the dissent, which JUSTICE STEVENS joined, made exactly this argument. See 515 U. S., at 895–896 (opinion of Souter, J.). The Court disagreed, holding that a policy that treated secular speech more favorably than religious speech discriminated on the basis of viewpoint.[4] 515 U. S., at 831. The Court reaffirmed this holding in *Good News Club*, 533 U. S., at 112, and n. 4.

Here, the Nondiscrimination Policy permitted membership requirements that expressed a secular viewpoint. See App. 93. (For example, the Hastings Democratic Caucus and the Hastings Republicans were allowed to exclude members who disagreed with their parties' platforms.) But religious groups were not permitted to express a religious viewpoint by limiting membership to students who shared their religious viewpoints. Under established

———————

[4] In *Rosenberger* the university argued that the denial of student activity funding for all groups that sought to express a religious viewpoint was "facially neutral." See Brief for Respondents in *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, O. T. 1994, No. 94–329, p. 2; 515 U. S., at 824–825. The *Rosenberger* dissenters agreed that the university's policy did not constitute viewpoint discrimination because "it applie[d] to Muslim and Jewish and Buddhist advocacy as well as to Christian," and it "applie[d] to agnostics and atheists as well as it does to deists and theists." *Id.*, at 895–896 (opinion of Souter, J.); cf. *ante*, at 2–3 (opinion of STEVENS, J.) (asserting that under Hastings' Nondiscrimination Policy "all acts of *religious* discrimination" are prohibited (emphasis added)). But the Court flatly rejected this argument. See 515 U. S., at 831 ("Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered").

precedent, this was viewpoint discrimination.[5]

It bears emphasis that permitting religious groups to limit membership to those who share the groups' beliefs would not have the effect of allowing other groups to discriminate on the basis of religion. It would not mean, for example, that fraternities or sororities could exclude students on that basis. As our cases have recognized, the right of expressive association permits a group to exclude an applicant for membership only if the admission of that person would "affec[t] in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U. S., at 648. Groups that do not engage in expressive association have no such right. Similarly, groups that are dedicated to expressing a viewpoint on a secular topic (for example, a political or ideological viewpoint) would have no basis for limiting membership based on religion because the presence of members with diverse religious beliefs would have no effect on the group's ability to express its views. But for religious groups, the situation is very different. This point was put well by a coalition of Muslim, Christian, Jewish, and Sikh groups: "Of course there is a strong interest in prohibiting religious discrimination where religion is irrelevant. But it is fundamentally confused to apply a rule against religious discrimination to a religious association." Brief for American Islamic Congress et al. as *Amici Curiae* 3.

*Sexual orientation.* The Hastings Nondiscrimination Policy, as interpreted by the law school, also discriminated on the basis of viewpoint regarding sexual morality. CLS

---

[5] It is not at all clear what JUSTICE STEVENS means when he refers to religious "status" as opposed to religious belief. See *ante*, at 2, n. 1. But if by religious status he means such things as the religion into which a person was born or the religion of a person's ancestors, then prohibiting discrimination on such grounds would not involve viewpoint discrimination. Such immutable characteristics are quite different from viewpoint.

has a particular viewpoint on this subject, namely, that sexual conduct outside marriage between a man and a woman is wrongful. Hastings would not allow CLS to express this viewpoint by limiting membership to persons willing to express a sincere agreement with CLS's views. By contrast, nothing in the Nondiscrimination Policy prohibited a group from expressing a contrary viewpoint by limiting membership to persons willing to endorse that group's beliefs. A Free Love Club could require members to affirm that they reject the traditional view of sexual morality to which CLS adheres. It is hard to see how this can be viewed as anything other than viewpoint discrimination.

## V

Hastings' current policy, as announced for the first time in the brief filed in this Court, fares no better than the policy that the law school invoked when CLS's application was denied. According to Hastings' brief, its new policy, contrary to the position taken by Hastings officials at an earlier point in this litigation, really does not require a student group to accept all comers. Now, Hastings explains, its policy allows "neutral and generally applicable membership requirements unrelated to 'status or beliefs.'" Brief for Respondent Hastings College of Law 5. As examples of permissible membership requirements, Hastings mentions academic standing, writing ability, "dues, attendance, and *even conduct requirements*." *Ibid.* (emphasis added).

It seems doubtful that Hastings' new policy permits registered groups to condition membership eligibility on whatever "conduct requirements" they may wish to impose. If that is the school's current policy, it is hard to see why CLS may not be registered, for what CLS demands is that members foreswear "unrepentant participation in or advocacy of a sexually immoral lifestyle." App. 146. That

should qualify as a conduct requirement.

If it does not, then what Hastings' new policy must mean is that registered groups may impose some, but not all, conduct requirements. And if that is the case, it is incumbent on Hastings to explain which conduct requirements are acceptable, which are not, and why CLS's requirement is not allowed. Hastings has made no effort to provide such an explanation.[6]

## VI

I come now to the version of Hastings' policy that the Court has chosen to address. This is not the policy that Hastings invoked when CLS was denied registration. Nor is it the policy that Hastings now proclaims—and presumably implements. It is a policy that, as far as the record establishes, was in force only from the time when it was first disclosed by the former dean in July 2005 until Hastings filed its brief in this Court in March 2010. Why we should train our attention on this particular policy and not the other two is a puzzle. But in any event, it is clear that the accept-all-comers policy is not reasonable in light of the purpose of the RSO forum, and it is impossible to say on the present record that it is viewpoint neutral.

## A

Once a state university opens a limited forum, it "must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U. S., at 829. Hastings' regulations on the registration of student groups impose only two substantive limitations: A group seeking registration must have student members and must be non-commercial. App. to Pet. for Cert. 82a–83a, Hastings Board of Directors, Policies and Regulations Applying to College Activities, Organiza-

---

[6]Nor does the Court clarify this point. Suggesting that any conduct requirement must relate to "gross misconduct," *ante*, at 4, n. 2, is not helpful.

tions and Students §34.10 (June 22, 1990) (hereinafter Hastings Regulations). Access to the forum is not limited to groups devoted to particular purposes. The regulations provide that a group applying for registration must submit an official document including "a statement of *its purpose*," *id.*, at 83a (Hastings Regulations §34.10.A.1 (emphasis added)), but the regulations make no attempt to define the limits of acceptable purposes. The regulations do not require a group seeking registration to show that it has a certain number of members or that its program is of interest to any particular number of Hastings students. Nor do the regulations require that a group serve a need not met by existing groups.

The regulations also make it clear that the registration program is not meant to stifle unpopular speech. They proclaim that "[i]t is the responsibility of the Dean to ensure an ongoing opportunity for the expression of a variety of viewpoints." *Id.*, at 82a (Hastings Regulations §33.11). They also emphatically disclaim any endorsement of or responsibility for views that student groups may express. *Id.*, at 85a (Hastings Regulations §34.10.D).

Taken as a whole, the regulations plainly contemplate the creation of a forum within which Hastings students are free to form and obtain registration of essentially the same broad range of private groups that nonstudents may form off campus. That is precisely what the parties in this case stipulated: The RSO forum "seeks to promote a diversity of viewpoints *among* registered student organizations, including viewpoints on religion and human sexuality." App. 216 (emphasis added).

The way in which the RSO forum actually developed corroborates this design. As noted, Hastings had more than 60 RSOs in 2004–2005, each with its own independently devised purpose. Some addressed serious social issues; others—for example, the wine appreciation and ultimate Frisbee clubs—were simply recreational. Some

organizations focused on a subject but did not claim to promote a particular viewpoint on that subject (for example, the Association of Communications, Sports & Entertainment Law); others were defined, not by subject, but by viewpoint. The forum did not have a single Party Politics Club; rather, it featured both the Hastings Democratic Caucus and the Hastings Republicans. There was no Reproductive Issues Club; the forum included separate pro-choice and pro-life organizations. Students did not see fit to create a Monotheistic Religions Club, but they have formed the Hastings Jewish Law Students Association and the Hastings Association of Muslim Law Students. In short, the RSO forum, true to its design, has allowed Hastings students to replicate on campus a broad array of private, independent, noncommercial organizations that is very similar to those that nonstudents have formed in the outside world.

The accept-all-comers policy is antithetical to the design of the RSO forum for the same reason that a state-imposed accept-all-comers policy would violate the First Amendment rights of private groups if applied off campus. As explained above, a group's First Amendment right of expressive association is burdened by the "forced inclusion" of members whose presence would "affec[t] in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U. S., at 648. The Court has therefore held that the government may not compel a group that engages in "expressive association" to admit such a member unless the government has a compelling interest, "'unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Ibid.* (quoting *Roberts*, 468 U. S., at 623).

There can be no dispute that this standard would not permit a generally applicable law mandating that private religious groups admit members who do not share the

groups' beliefs. Religious groups like CLS obviously engage in expressive association, and no legitimate state interest could override the powerful effect that an accept-all-comers law would have on the ability of religious groups to express their views. The State of California surely could not demand that all Christian groups admit members who believe that Jesus was merely human. Jewish groups could not be required to admit anti-Semites and Holocaust deniers. Muslim groups could not be forced to admit persons who are viewed as slandering Islam.

While there can be no question that the State of California could not impose such restrictions on all religious groups in the State, the Court now holds that Hastings, a state institution, may impose these very same requirements on students who wish to participate in a forum that is designed to foster the expression of diverse viewpoints. The Court lists four justifications offered by Hastings in defense of the accept-all-comers policy and, deferring to the school's judgment, *ante*, at 21, the Court finds all those justifications satisfactory, *ante*, at 21–24. If we carry out our responsibility to exercise our own independent judgment, however, we must conclude that the justifications offered by Hastings and accepted by the Court are insufficient.

The Court first says that the accept-all-comers policy is reasonable because it helps Hastings to ensure that "'leadership, educational, and social opportunities'" are afforded to all students. *Ante*, at 21–22 (quoting Brief for Respondent Hastings College of Law 32). The RSO forum, however, is designed to achieve these laudable ends in a very different way—by permitting groups of students, no matter how small, to form the groups they want. In this way, the forum multiplies the opportunity for students to serve in leadership positions; it allows students to decide which educational opportunities they wish to pursue through participation in extracurricular activities; and it permits

them to create the "social opportunities" they desire by forming whatever groups they wish to create.

Second, the Court approves the accept-all-comers policy because it is easier to enforce than the Nondiscrimination Policy that it replaced. It would be "a daunting labor," the Court warns, for Hastings to try to determine whether a group excluded a member based on belief as opposed to status. *Ante*, at 22; see also *ante*, at 2–3, n. 1 (opinion of STEVENS, J.) (referring to the "impossible task of separating out belief-based from status-based religious discrimination").

This is a strange argument, since the Nondiscrimination Policy prohibits discrimination on substantially the same grounds as the antidiscrimination provisions of many States,[7] including California, and except for the inclusion of the prohibition of discrimination based on sexual orientation, the Nondiscrimination Policy also largely tracks federal antidiscrimination laws.[8] Moreover, Hastings now willingly accepts greater burdens under its latest policy, which apparently requires the school to distinguish between certain "conduct requirements" that are allowed and others that are not. Nor is Hastings daunted by the labor of determining whether a club admissions exam legitimately tests knowledge or is a pretext for screening

––––––––

[7] See, *e.g.*, Cal. Gov. Code Ann. §12940(a) (West 2005); N. J. Stat. Ann. §10:5–12(a) (West 2002); N. Y. Exec. Law Ann. §296(1)(a) (West 2010).

[8] See, *e.g.*, Civil Rights Act of 1964, 42 U. S. C. §2000e *et seq.* (Title VII); Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U. S. C. §2000d *et seq.* (Title VI); Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. §621 *et seq.;* Americans with Disabilities Act of 1990, 104 Stat. 337, 42 U. S. C. §12101 *et seq.* However, Title VII, which prohibits employment discrimination on the basis of religion, provides that religious associations and schools can hire on the basis of religion and that any employer can hire on the basis of religion if it is a bona fide occupational qualification. 42 U. S. C. §§2000e–1(a), 2000e–2(e).

out students with disfavored beliefs. Asked at oral argument whether CLS could require applicants to pass a test on the Bible, Hastings' attorney responded: "If it were truly an objective knowledge test, it would be okay." Tr. of Oral Arg. 52. The long history of disputes about the meaning of Bible passages belies any suggestion that it would be an easy task to determine whether the grading of such a test was "objective."

Third, the Court argues that the accept-all-comers policy, by bringing together students with diverse views, encourages tolerance, cooperation, learning, and the development of conflict-resolution skills. *Ante*, at 23. These are obviously commendable goals, but they are not undermined by permitting a religious group to restrict membership to persons who share the group's faith. Many religious groups impose such restrictions. See, *e.g.,* Brief for Agudath Israel of America as *Amicus Curiae* 3 ("[B]ased upon millennia-old Jewish laws and traditions, Orthodox Jewish institutions . . . regularly differentiate between Jews and non-Jews"). Such practices are not manifestations of "contempt" for members of other faiths. Cf. *ante*, at 6 (opinion of STEVENS, J.) (invoking groups that have "contempt for Jews, blacks, and women"). Nor do they thwart the objectives that Hastings endorses. Our country as a whole, no less than the Hastings College of Law, values tolerance, cooperation, learning, and the amicable resolution of conflicts. But we seek to achieve those goals through "[a] confident pluralism that conduces to civil peace and advances democratic consensus-building," not by abridging First Amendment rights. Brief for Gays and Lesbians for Individual Liberty as *Amicus Curiae* 35.

Fourth, the Court observes that Hastings' policy "incorporates—in fact, subsumes—state-law proscriptions on discrimination." *Ante*, at 23. Because the First Amendment obviously takes precedence over any state law, this

would not justify the Hastings policy even if it were true—
but it is not. The only Hastings policy considered by the
Court—the accept-all-comers policy—goes far beyond any
California antidiscrimination law. Neither Hastings nor
the Court claims that California law demands that state
entities must accept all comers. Hastings itself certainly
does not follow this policy in hiring or student admissions.

Nor is it at all clear that California law requires Hast-
ings to deny registration to a religious group that limits
membership to students who share the group's religious
beliefs. Hastings cites no California court decision or
administrative authority addressing this question. In-
stead, Hastings points to a statute prohibiting discrimina-
tion on specified grounds, including religion or sexual
orientation, "in any program or activity *conducted by*"
certain postsecondary educational institutions. Cal. Educ.
Code Ann. §66270 (West Supp. 2010) (emphasis added).
Hastings, however, does not conduct the activities of the
student groups it registers. Indeed, Hastings disclaims
such responsibility, stating both in its regulations and its
Handbook for Student Organizations that it "*does not
sponsor* student organizations and therefore does not
accept liability for activities of student organizations."
App. to Pet. for Cert. 85a (Hastings Regulations §34.10.D);
App. 250. In addition, as CLS notes, another provision of
California law specifically exempts "any funds that are
used directly or indirectly for the benefit of student or-
ganizations" from a ban on state funding of private groups
that discriminate on any of the grounds listed in §66270.
See §92150 (West Supp. 2010).

The authority to decide whether §66270 or any other
provision of California law requires religious student
groups at covered institutions to admit members who do
not share the groups' religious views is of course a ques-
tion of state law that we cannot resolve. The materials
that have been brought to our attention, however, provide

little support for the majority's suggested interpretation.

In sum, Hastings' accept-all-comers policy is not reasonable in light of the stipulated purpose of the RSO forum: to promote a diversity of viewpoints "*among*"—not within— "registered student organizations." App. 216 (emphasis added).[9]

## B

The Court is also wrong in holding that the accept-all-comers policy is viewpoint neutral. The Court proclaims that it would be "hard to imagine a more viewpoint-neutral policy," *ante*, at 28, but I would not be so quick to jump to this conclusion. Even if it is assumed that the policy is viewpoint neutral on its face,[10] there is strong

---

[9] Although we have held that the sponsor of a limited public forum "must respect the lawful boundaries it has itself set," *Rosenberger,* 515 U. S., at 829, the Court now says that, if the exclusion of a group is challenged, the sponsor can retroactively redraw the boundary lines in order to justify the exclusion. See *ante*, at 21, n. 17. This approach does not respect our prior holding.

[10] In *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217 (2000), the Court considered a university rule permitting the "defund[ing]" of a registered student group through a student referendum. See *id.*, at 224–225. "To the extent the referendum substitutes majority determinations for viewpoint neutrality," the Court observed, "it would undermine the constitutional protection the [university's registered student organization] program requires." *Id.*, at 235. "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Ibid.*

Hastings' accept-all-comers policy bears a resemblance to the *Southwark* referendum process. Both permit the majority to silence a disfavored organization. There is force to CLS's argument that "[a]llowing all students to join and lead any group, even when they disagree with it, is tantamount to establishing a majoritarian heckler's veto" and "potentially turn[s] every group into an organ for the already-dominant opinion." Brief for Petitioner 51.

The Court attempts to distinguish *Southworth* as involving a funding mechanism for student groups that operated selectively, based on groups' viewpoints. *Ante*, at 29, n. 25. But that mechanism—a student referendum process—placed all students at risk of "being required to

evidence in the record that the policy was announced as a pretext.

The adoption of a facially neutral policy for the purpose of suppressing the expression of a particular viewpoint is viewpoint discrimination. See *Crawford* v. *Board of Ed. of Los Angeles*, 458 U. S. 527, 544 (1982) ("[A] law neutral on its face still may be unconstitutional if motivated by a discriminatory purpose"). A simple example illustrates this obvious point. Suppose that a hated student group at a state university has never been able to attract more than 10 members. Suppose that the university administration, for the purpose of preventing that group from using the school grounds for meetings, adopts a new rule under which the use of its facilities is restricted to groups with more than 25 members. Although this rule would be neutral on its face, its adoption for a discriminatory reason would be illegal.

Here, CLS has made a strong showing that Hastings' sudden adoption and selective application of its accept-all-comers policy was a pretext for the law school's unlawful denial of CLS's registration application under the Nondiscrimination Policy.

*Shifting policies.* When Hastings denied CLS's application in the fall of 2004, the only policy mentioned was the Nondiscrimination Policy. In July 2005, the former dean suggested in a deposition that the law school actually followed the very different accept-all-comers policy. In March of this year, Hastings' brief in this Court rolled out still a third policy. As is recognized in the employment discrimination context, where issues of pretext regularly arise, "[s]ubstantial changes over time in [an] employer's

––––––––––

pay fees which are subsidies for speech they find objectionable, even offensive," solely upon a majority vote of the student body. See 529 U. S., at 230, 235. That is no different in principle than an accept-all-comers policy that places all student organizations at risk of take-over by a majority that is hostile to a group's viewpoint.

proffered reason for its employment decision support a finding of pretext." *Kobrin* v. *University of Minnesota,* 34 F. 3d 698, 703 (CA8 1994); see also, *e.g.*, *Aragon* v. *Republic Silver State Disposal Inc.*, 292 F. 3d 654, 661 (CA9 2002); *Cicero* v. *Borg-Warner Automotive, Inc.*, 280 F. 3d 579, 592 (CA6 2001).

*Timing.* The timing of Hastings' revelation of its new policies closely tracks the law school's litigation posture. When Hastings denied CLS registration, it cited only the Nondiscrimination Policy. Later, after CLS alleged that the Nondiscrimination Policy discriminated against religious groups, Hastings unveiled its accept-all-comers policy. Then, after we granted certiorari and CLS's opening brief challenged the constitutionality—and the plausibility—of the accept-all-comers policy, Hastings disclosed a new policy. As is true in the employment context, "[w]hen the justification for an adverse . . . action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendant's decision." *Cicero, supra*, at 592.

*Lack of documentation.* When an employer has a written policy and then relies on a rule for which there is no written documentation, that deviation may support an inference of pretext. See, *e.g.*, *Diaz* v. *Eagle Produce Ltd. Partnership*, 521 F. 3d 1201, 1214 (CA9 2008); *Rudin* v. *Lincoln Land Community College*, 420 F. 3d 712, 727 (CA7 2005); *Machinchick* v. *PB Power, Inc.*, 398 F. 3d 345, 354, n. 29 (CA5 2005); *Russell* v. *TG Missouri Corp.*, 340 F. 3d 735, 746 (CA8 2003); *Mohammed* v. *Callaway*, 698 F. 2d 395, 399–400, 401 (CA10 1983).

Here, Hastings claims that it has had an accept-all-comers policy since 1990, but it has not produced a single written document memorializing that policy. Nor has it cited a single occasion prior to the dean's deposition when this putative policy was orally disclosed to either student groups interested in applying for registration or to the

Office of Student Services, which was charged with reviewing the bylaws of applicant groups to ensure that they were in compliance with the law school's policies.

*Nonenforcement.* Since it appears that no one was told about the accept-all-comers policy before July 2005, it is not surprising that the policy was not enforced. The record is replete with evidence that Hastings made no effort to enforce the all-comers policy until after it was proclaimed by the former dean. See, *e.g.*, App. to Pet. for Cert. 118a (Hastings Democratic Caucus); *id.*, at 110a (Association of Trial Lawyers of America at Hastings); *id.*, at 146a–147a (Vietnamese American Law Society); *id.*, at 142a–143a (Silent Right); App. 192 (La Raza). See generally *supra*, at 7–8. If the record here is not sufficient to permit a finding of pretext, then the law of pretext is dead.

The Court—understandably—sidesteps this issue. The Court states that the lower courts did not address the "argument that Hastings selectively enforces its all-comer policy,"[11] that "this Court is not the proper forum to air the issue in the first instance," and that "[o]n remand, the Ninth Circuit may consider CLS's pretext argument if, and to the extent, it is preserved." *Ante*, at 31–32.

Because the Court affirms the entry of summary judgment in favor of respondents, it is not clear how CLS will be able to ask the Ninth Circuit on remand to review its claim of pretext. And the argument that we should not

––––––––––

[11] As previously noted, CLS consistently argued in the courts below that Hastings had applied its registration policy in a discriminatory manner. See *supra*, at 9–10, n. 1. The Court would ignore these arguments because counsel for CLS acknowledged below that Hastings *has* an all-comers policy. See *ante*, at 9, n. 5 (quoting examples). But as the Court itself acknowledges, counsel for CLS stated at oral argument in this Court that "the Court needs to . . . reach the constitutionality of the all-comers policy *as applied to CLS in this case*." Tr. of Oral Arg. 59 (emphasis added); *ante*, at 9, n. 5. And as the record shows, CLS has *never* ceded its argument that Hastings applies its accept-all-comers policy unequally.

address this issue of pretext because the Ninth Circuit did not do so is hard to take, given that the Ninth Circuit barely addressed anything, disposing of this case in precisely two sentences.

Neither of those two sentences addressed the "novel question," *ante*, at 1, to which the bulk of this Court's opinion is devoted, *i.e.*, whether the accept-all-comers policy is reasonable in light of the purposes of the RSO forum and is viewpoint neutral, see *ante*, at 17–31. If it is appropriate for us to consider that issue, then the Ninth Circuit's failure to address the issue of pretext should not stand in the way of review by this Court.

## C

One final aspect of the Court's decision warrants comment. In response to the argument that the accept-all-comers-policy would permit a small and unpopular group to be taken over by students who wish to silence its message, the Court states that the policy would permit a registered group to impose membership requirements "designed to ensure that students join because of their commitment to a group's vitality, not its demise." *Ante*, at 27. With this concession, the Court tacitly recognizes that Hastings does not really have an accept-all-comers policy—it has an accept-some-dissident-comers policy—and the line between members who merely seek to change a group's message (who apparently must be admitted) and those who seek a group's "demise" (who may be kept out) is hopelessly vague.

Here is an example. Not all Christian denominations agree with CLS's views on sexual morality and other matters. During a recent year, CLS had seven members. Suppose that 10 students who are members of denominations that disagree with CLS decided that CLS was misrepresenting true Christian doctrine. Suppose that these students joined CLS, elected officers who shared their

views, ended the group's affiliation with the national organization, and changed the group's message. The new leadership would likely proclaim that the group was "vital" but rectified, while CLS, I assume, would take the view that the old group had suffered its "demise." Whether a change represents reform or transformation may depend very much on the eye of the beholder.

JUSTICE KENNEDY takes a similarly mistaken tack. He contends that CLS "would have a substantial case on the merits if it were shown that the all-comers policy was . . . used to infiltrate the group or challenge its leadership in order to stifle its views," *ante*, at 4 (concurring opinion), but he does not explain on what ground such a claim could succeed. The Court holds that the accept-all-comers policy is viewpoint neutral and reasonable in light of the purposes of the RSO forum. How could those characteristics be altered by a change in the membership of one of the forum's registered groups? No explanation is apparent.

In the end, the Court refuses to acknowledge the consequences of its holding. A true accept-all-comers policy permits small unpopular groups to be taken over by students who wish to change the views that the group expresses. Rules requiring that members attend meetings, pay dues, and behave politely, see *ante*, at 27, would not eliminate this threat.

The possibility of such takeovers, however, is by no means the most important effect of the Court's holding. There are religious groups that cannot in good conscience agree in their bylaws that they will admit persons who do not share their faith, and for these groups, the consequence of an accept-all-comers policy is marginalization. See Brief for Evangelical Scholars (Officers and 24 Former Presidents of the Evangelical Theological Society) et al. as *Amici Curiae* 19 (affirmance in this case "will allow every public college and university in the United States to exclude all evangelical Christian organizations"); Brief for

Agudath Israel of America as *Amicus Curiae* 3, 8 (affirmance would "point a judicial dagger at the heart of the Orthodox Jewish community in the United States" and permit that community to be relegated to the status of "a second-class group"); Brief for Union of Orthodox Jewish Congregations of America as *Amicus Curiae* 3 (affirmance "could significantly affect the ability of [affiliated] student clubs and youth movements . . . to prescribe requirements for their membership and leaders based on religious beliefs and commitments"). This is where the Court's decision leads.

\*    \*    \*

I do not think it is an exaggeration to say that today's decision is a serious setback for freedom of expression in this country. Our First Amendment reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). Even if the United States is the only Nation that shares this commitment to the same extent, I would not change our law to conform to the international norm. I fear that the Court's decision marks a turn in that direction. Even those who find CLS's views objectionable should be concerned about the way the group has been treated—by Hastings, the Court of Appeals, and now this Court. I can only hope that this decision will turn out to be an aberration.